THE CHAUNCEY M. DEPEW. THE GEORGE W. PRATT. THE LILA M. HARDY. THE ALFRED. CHAPMAN DERRICK & WRECKING CO. v. THREE TUGS. CORNELL STEAMBOAT CO. v. THE AL-FRED.[1]

(District Court, S. D. New York. January 23, 1894.)

1. COLLISION—VESSELS AT ANCHOR—CROWDED CHANNEL—DREDGE LAWFULLY MOORED.

It is obligatory on their owners to raise, when practicable, vessels sunk in collision. Hence, a derrick anchored in the channel of the East river under a permit from the secretary of the treasury, occupied in raising a sunken vessel, and, though a partial obstruction to navigation, not such a complete obstruction as to constitute a nuisance, was *held* not unlawfully anchored, though off the regular anchorage grounds, and not in fault for damage suffered by a vessel which collided with her.

2. SAME—DREDGE ANCHORED IN NARROW CHANNEL WAY—LIABILITY OF COL-LIDING VESSELS.

A derrick anchored in the crowded channel way of the East river, en-gaged in raising a sunken vessel, although not unlawfully in such position, was *held* not entitled to all the immunities of vessels anchored on anchor-age grounds; and certain tugs, which collided with her in spite of skill and diligence exercised by their pilots, were *held* not responsible for the damage to the derrick.

3. SAME—ANCHORAGE GROUNDS—ACT AUTHORIZING SECRETARY OF TREASURY TO ESTABLISH—APPLICATION TO VESSELS ENGAGED IN RAISING WRECKS.

Whether the anchoring of a derrick for the purpose of raising a wreck falls within the purview of the act of May 16, 1888, or the authority of the secretary of the treasury thereunder "to define and establish an an-chorage ground," etc., quaere.

In Admiralty. Libels and cross libels for collision. Dismissed.

Wing, Shoudy & Putnam and Mr. Burlingham, for Chapman, etc., Co. and the Alfred.

Carpenter & Mosher, for the Chauncey M. Depew.

Benedict & Benedict, for the George W. Pratt and the Lila M. Hardy.

BROWN, District Judge. The first three libels above named were filed by the owners of the derrick Alfred to recover damages sustained by the derrick from three separate collisions with the steam tugs above named, all happening in the course of about two hours, between half past 7 and half past 9 A. M., on May 17, 1893, while the derrick was at anchor a little way above the Brooklyn bridge, and off pier 40, in the East river, over the sunken wreck Emma, which it was there engaged in raising.

The width of the East river in that locality is about 1,350 feet from pier to pier. It is the narrowest part of the river. At times the concourse of vessels there is large, and in passing in opposite directions, great care and skill are needed at such times to avoid collisions, even when there are no fixed obstructions. The derrick was anchored about 500 feet off from the New York pier, and was

[1] Reported by E. G. Benedict, Esq., of the New York bar.

fastened by two anchors at her bow and two at her stern. She had also lines and chains running to the wreck beneath her, which lay on the bottom, in 75 feet of water. The tide was strong flood. Each of the tugs above named was going up river with a tow; the first two with a float, or scows, alongside; the Hardy had two scows astern, on a hawser. The testimony in behalf of each shows that at the time when she passed under the bridge, the river on the Brooklyn side was much incumbered by other vessels. Each claimed that in consequence of these incumbrances, and by reason of the cross set of the tide, she was forced towards the westerly side of the river, so as to come in contact with the derrick, notwithstanding the exercise of all reasonable care and skill to avoid it.

The first collision was between the Depew's car float and the derrick; it was comparatively slight, rubbing along the eastwardly side of the derrick; but, as claimed by the libelants, cutting two lines that ran to the wreck beneath, and doing some other slight damage. The collision of the Pratt was with the starboard stern corner of the derrick, which was struck by the Pratt's bow, and swung outwards, so as to point nearly across the river towards the Brooklyn shore; considerable damage was thereby done to the derrick, and also to the Pratt, and for the latter damage the cross libel was filed by the Cornell Steamboat Company. The third collision was with one of the Hardy's scows, which was astern of her, on a hawser. In this collision, the port stern corner of the derrick was struck and damaged.

The cases having so much testimony in common, they were, for convenience, tried together. For the tugs it is contended that the derrick was an unlawful obstruction, having no right to be at anchor where she was, except at the risk of all the damages which she might suffer, or might inflict on others. The libelants, in their justification, produce a permit from the secretary of the treasury, dated January 9, 1893, in the following words:

"Referring to your letter of the 6th instant, you are informed that the department has no objection to the mooring of two of your derricks over the barge Emma which was recently sunk with about five hundred tons of coal in the East river off pier 39 provided it does not interfere with navigation, is at your risk, and that the proper lights are exhibited."

In a subsequent letter, dated May 3, 1893, in answer to further inquiries of the libelants, the department gave its construction of the meaning of the above permit, as follows:

"Referring to your letter of the 1st instant, in relation to mooring your derricks over the sunken barge Emma, and other permits granted in similar cases; you are informed that the department intended by its letter of January 9th last to authorize you to moor your derricks over said vessels for the purpose of raising and removing the same.

"The proviso that it should not interfere with navigation, is understood to mean that you should not completely block up the channel nor seriously interfere with the passage of vessels.

"The risk that you assume in such cases, is for such damage as the courts might award in case of collision between your barges and other vessels.

"The department intended by its letter dated November 17, 1892, to au-

thorize you to commence work on a wreck as it might occur, without waiting for the permit, but expected that you would apply immediately for such permission."

It does not appear what was the supposed value of the wreck Emma; but the libelants admit a contract to receive $700 for raising her. The wreck lay so deep that she was no obstruction to navigation. The state act on the subject of removing wrecks has, therefore, no application.

Considerable discussion has been had with reference to the permit issued by the secretary of the treasury. I have considerable doubt, however, whether the anchoring of a derrick for the purpose of raising a wreck falls within the purview of the act of May 16, 1888, (1 Supp. Rev. St. 586,) or the authority of the secretary of the treasury thereunder "to define and establish *an anchorage ground* for vessels * * * in the Hudson and East rivers, and to adopt suitable regulations in relation thereto;" or whether the act applies at all where the anchorage is not of vessels engaged in navigation, but is in the business, and for the purpose of raising wrecks; any more than it would apply to vessels throwing out an anchor in extremity or in distress. In practice, however, it seems to have been customary, when raising wrecks, to obtain a permit to anchor from the secretary of the treasury; and for revenue cutters to visit vessels found at anchor off the prescribed "anchorage ground," to see if such permits have been secured. It is not necessary, however, to consider this point further; for I am satisfied that upon the proper construction of the permit itself, the liability of the ship is neither enlarged nor diminished from that which would exist independently of the statute concerning anchorage. If this anchoring of the derrick fell under the provisions of the act of 1888, the permit was sufficient to absolve the libelants from the penalty prescribed by it; and the conditions of the permit, under the explanations of the letter of May 3d were, I think, simply designed to leave the rights and liabilities of the libelants, and of others, to be determined by the courts, unaffected by the anchorage act.

There can be no doubt from the evidence in this case, as well as from daily observation and common knowledge, that the anchorage of a vessel in the narrow, and often crowded, passage where this derrick was anchored must of necessity, for the time being, be a serious embarrassment to the navigation of the East river, whenever there is a concourse of vessels or tows meeting or passing in that vicinity. Under certain conditions of tide and weather, such a concourse is very frequent, and almost of daily occurrence. Under such circumstances, and on the flood tide, this derrick was, therefore, a very serious embarrassment; and a partial obstruction to the free and easy navigation of the East river.

The question, however, is not whether the derrick was a partial obstruction to navigation, but whether it was an unlawful obstruction. Sailing vessels in that locality are often an obstruction to

steamers; tows, an obstruction to both; and slow boats, an obstruction to faster ones. But none of these are unlawful; and none are liable, except for negligence. Dredges in a channel way are partial obstructions, but lawful ones.

Some of the witnesses considered that this derrick was more of an obstruction, and would present greater difficulties, to vessels undertaking to pass her, than a sail vessel in motion at the same spot; because, in case of danger, some help in avoiding collision might be expected from the sail vessel; other witnesses thought that a stationary object presents less difficulty, because her position is more certain, and therefore the more accurately to be counted on in maneuvers to avoid it.

The Emma was evidently supposed to be worth raising, or the libelant would not have been employed to undertake that work. The obligation of the owners of vessels that have been sunk by collision to raise their vessels when practicable, has been repeatedly recognized in litigations on the question of damages, as a duty towards the faulty party. Towboat Co. v. Pettie, 1 U. S. App. 62, 1 C. C. A. 314, 49 Fed. 464; The Havilah, 1 U. S. App. 138, 1 C. C. A. 519; 50 Fed. 333, and cases there cited.

The raising of sunken vessels, even when not necessary for the benefit of the public, and the use of the river for raising vessels, are, therefore, legitimate and lawful; and, so far as I can perceive, as much so as is the navigation of the river by other vessels for other purposes.

There may be extreme cases, in which the anchoring of one vessel for the purpose of raising another in a very narrow passage, may so completely obstruct navigation as to amount to a nuisance, which could not be lawfully maintained, even for the rescue of one's own property. But this case is far from being the case of a public nuisance. Reasonable room still remained for ordinary navigation; much more than is often left in cases of dredging, (The Virginia Ehrman, 97 U. S. 309,) and under the permit, which removes any question upon the statute, I cannot regard the mere anchoring of the derrick in the place where she was anchored for the raising of the wreck, as unlawful. The derrick remained there no longer than was necessary for that purpose; and no negligence is shown in the manner of anchoring, or handling the derrick. The cases of The Scioto, 2 Ware, 367; The Clara, 23 Wall. 1; and Strout v. Foster, 1 How. 89,—are therefore inapplicable; and no decree should be given against the derrick.

As regards the claims made against the tugs, it is to be observed that the derrick, on the other hand, not lying upon any authorized anchorage ground, was not entitled to all the immunities of vessels so anchored and lying out of the usual channel way. Her position, on the contrary, was in the channel way, and though lawful, was in the midst of a busy traffic, where her presence at times added greatly to the difficulties of navigation by other vessels. Those vessels were, doubtless, required to use skill and diligence to avoid

the derrick and each other; but they were not otherwise answerable for the results. And in determining whether skill and diligence have been exercised, the mere fact of collision with the derrick in a place like this, is no such prima facie evidence of negligence as in the ordinary case of a collision with a wharf, or with a vessel moored at a wharf, or upon ground out of the channel way and set apart for anchorage.

Considering all the circumstances, and the obstructions by other vessels that are so fully detailed by the witnesses for each tug, I am of the opinion that neither of the tugs was lacking in reasonable diligence and skill, from the time when the danger of collision became appreciable; and that no specific fault is established against either. It was no fault in the tugs to shape their courses originally for the wide channel way on the right, where the rule of the road, the state statute, and custom required them to go; instead of trying the narrower channel way to the left.

There is no doubt that during the two hours in which these collisions happened, there was an unusually large concourse of vessels coming and going past the derrick. They were going at different speeds, and not far apart; the tugs were incumbered and slow; the tide was strong, setting crosswise, and changing in strength and direction; the derrick was anchored in an unusual place, and in the midst of the cross tide; the pilots were wholly unaccustomed and untrained to avoid an anchored vessel in that location; and no previous experience was likely to be perfectly adequate to suggest at once all that was possible, or all that was needed, to avoid the derrick with certainty. Since the event, no doubt, modes can now be pointed out by which the collisions might have been avoided. But at the time it could not be foreseen just what movements the other vessels would make. The circumstances were extraordinary; and the fact that these three pilots all got into collision so nearly at the same time, though they had previously avoided the derrick when hauling other tows, tends to corroborate their testimony to the extraordinary difficulties of this occasion, and to absolve them from the charge of negligence.

**The result is, that all the libels should be dismissed with costs.**