MERRITT & CHAPMAN DERRICK & WRECKING CO. v. CORNELL STEAMBOAT CO.

(District Court, S. D. New York. December 23, 1909.)

COLLISION (§ 105*)—EVIDENCE—UNAVOIDABLE ACCIDENT.

Collision in Hell Gate between the tow of the tug Morse and a lighter moored alongside of the steamer Whitney, lying stranded on Flood Rock. The Whitney went ashore in a fog and a permit had been obtained from the Supervisor of Anchorages for the libellant to moor such of its plant as might be found necessary in salvage operations. The Morse bound from Boston to New York with a light hawser tow brought two of her barges in contact with the lighter. Numerous charges of fault against

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the Morse dismissed and *held* that the collision was caused by the presence of a schooner in the channel between Mill Rock and Ward's Island, which forced the Morse to attempt a passage through the channel between the Whitney and Hallett's Point and rendered collision unavoidable.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 105.*]

(Syllabus by the Judge.)

In Admiralty. Action by the Merritt & Chapman Derrick & Wrecking Company against the Cornell Steamboat Company, to recover for injuries by collision. Libel dismissed.

Wing, Putnam & Burlingham, for libellant.
Amos Van Etten and J. Parker Kirlin, for respondent.

ADAMS, District Judge. This action was brought by the Merritt & Chapman Derrick & Wrecking Company against the Cornell Steamboat Company, the owner of the tug C. W. Morse, for the damages, said to be $17,500, caused by the sinking and loss of the derrick Will and her cargo by collision with the tow of the Morse about 2:10 p. m. on June 2, 1908, in Hell Gate. The Will was lying on the starboard side of the steamboat H. M. Whitney, which was lying stranded on Flood Rock. The weather was clear and the tidal current running ebb at the rate of 5 or 6 miles per hour. The place of collision was near the middle of the channel between Hallett's Point and Mill Rock.

The libel alleges:

"Fourth. The Metropolitan Line Steamship H. M. Whitney, having stranded on Flood Rock in Hellgate during the evening of May 23rd, 1908, her master and agents had employed the libellant to salve said vessel and cargo, and the libellant had duly procured a permit granted by the Supervisor of Anchorages for libellant's wrecking plant to anchor in the channel, in and about the Whitney, for the purpose of floating the ship and of recovering the cargo thereon. Immediately after the disaster above mentioned, the libellant was engaged in such services with its wrecking plant, including the derrick Will.

"Fifth. On information and belief, in the afternoon of June 2nd—9 days after said stranding—the libellant in the course of its salvage operations, had the derrick Will along the starboard side or quarter of the H. M. Whitney which was lying on Flood Rock and heading nearly North and South. Cargo was being taken out of said ship, placed upon lighters, and transported to Brooklyn. The lighter Will at the time had on board a large quantity of salved goods, including cotton, wool, rubber and other merchandise. She was securely moored to said steamship, leaving a clear channel between them and Hallett's Point through which the larger vessels were accustomed to pass. There was also another and broader opening ahead of the Whitney, between Mill Rock and Ward's Island, which was also used by passing vessels. The weather at the time was clear, the wind light, and there were no other vessels in the immediate vicinity.

"Sixth. At a little after two o'clock in the afternoon when the tide was ebb the respondent's tug, C. W. Morse, was seen to come around from the Sound with a long hawser tow. The Morse headed to the westward, then apparently changed its course to pass by Hallett's Point. Owing to the scope of hawser and the size of her tow, which consisted of 5 large barges in 2 tiers, the starboard barges came broadside against the lighter Will, with great force, so that the Will's bow was crushed in, causing her to fill and capsize with the loss of her entire cargo. She finally floated bottom up in the ebb-tide towards the northerly end of Blackwell's Island, where she was picked up and righted, but found to be a total loss. Said barges were without motive power, and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

were entirely dependent on the movements of the C. W. Morse, whose pilot and officers were directing their navigation."

, * * * * * * * * * * * *

"Eighth. Said collision and damages were not due to any fault on the part of the libellant, or of those engaged in its behalf in the salvage operations, but were solely due to the faults of the respondent, and its tug, the C. W. Morse, as follows: towing through the Gate with too long hawser; too large and unwieldy a tow; no competent officers properly acquainted with the locality and the salvage operations.; no proper lookout; not seeing the Whitney as soon as she should have been seen; not. making sufficient allowance for the currents and set of the tide; not keeping her tow 'clear from the salvor's plant in plain view; not taking reasonable precautions to pass; not slowing or stopping, so as to moderate the violence of the contact, and in other faults which will be shown upon the trial hereof."

The answer, after some admissions and denials, states:

"Fourth: It is admitted that the steamship H. M. Whitney was stranded on Flood Rock on or about the time set forth in the libel, but this respondent has no knowledge or information relating to the other matters alleged in the fourth paragraph of the libel, except upon information and belief it is alleged that on or about the 25th day of May, 1908, the libellant wrote a letter to the Supervisor of Anchorages in New York City as follows:

'Dear Sir: Permission is hereby requested to moor such of our plant as may be found necessary in the vicinity of Mill Rock, Hell Gate, East River, for the purpose of raising Steamship "H. M. Whitney" sunk there.'

To which letter the Supervisor of Anchorages on the 26th day of May, 1908, made reply as follows:

'Merritt & Chapman Derrick & Wrecking Company, #17 Battery Place, New York City.

Gentlemen: Agreeably to your request of the 25th instant, permission is hereby granted to moor such of your plant as may be found necessary in the vicinity of Mill Rock, Hell Gate, East River, for the purpose of raising Steamship "H. M. Whitney."

In granting this permit, it is understood that your plant must comply with all the navigation laws in regard to lights, fog signals, etc., and that the Government assumes no responsibility.'

Fifth: This respondent has no knowledge or information of the matters set forth in the fifth paragraph of the libel, except it is admitted that the derrick Will was alongside of the steamship H. M. Whitney, which was lying on or near Flood Rock, heading nearly north and south, and that such derrick was on the starboard side or quarter of the steamship. It is upon information and belief denied as true that.there was a clear channel left between the derrick and Hallett's Point; the condition of the wind is denied, and the statement . that there were no other vessels in the immediate vicinity is also denied.

Sixth: It is admitted that on the 2nd day of June at about two o'clock in the afternoon, the respondent's tug C. W. Morse came from the Sound with a hawser tow, consisting of five barges in two tiers. It is further admitted that the starboard barge collided with the lighter Will, injuring the lighter, and it is also admitted that the barges in tow of the Morse were dependent on the Morse for their movements. As to the remaining allegations in the sixth paragraph of the libel this respondent has no knowledge, and therefore denies the same."

* * * * * * * * * * * *

"Eleventh: For a further and separate answer to the libel filed herein, this respondent, repeating all the foregoing allegations or such of them as are material to this separate answer the same as if they were herein realleged, respectfully shows to the court:

The steamtug C. W. Morse with a tow left New York on May 23d, 1908, at about two o'clock in the afternoon, destined for Boston; that the tug was. in charge of a competent navigator, who was at the wheel at the time of the collision mentioned in the libel; that the said tug remained at Boston until

the 27th day of May, 1908, when she left Boston with a tow bound for New York; that while said steamtug was at Boston the master of the same was informed from a newspaper report in the Sunday Post published at Boston Sunday morning, May 24th, 1908, as follows:

'Boston Liner Ashore.

Henry M. Whitney Strikes While Coming up East River, N. Y.

New York, May 23.—In heavy fog tonight the Henry M. Whitney of the Metropolitan Line, bound for Boston with a large cargo, went ashore on what is known as Nigger Point, Ward's Island, in the East River.'

That the said steamtug with a tow as described in the libel arrived at Hell Gate on the 2nd of June, 1908, at about two o'clock in the afternoon; that the tow was properly made up and the tug had her tow on hawsers such as are ordinary and usual for proper navigation of such a fleet; that at that time the tide was strong ebb and the wind was a strong wind from the Northwest: that when the Morse arrived at a point opposite Sunken Meadows, the tug slowed down to one bell and blew one whistle; that the master of said tug was expecting to find the Whitney at Nigger Point and directed his navigation accordingly; that no warnings or signals were given to indicate that there was any obstruction to navigation by the Whitney or by libellant's lighter, and the captain of the Morse was unable to discover the position of the Whitney and the lighter until about opposite Nigger Point, and as he came around Nigger Point and observed the situation of the steamship and the lighter the course of the Morse was directed to the broader channel mentioned in the libel between Flood Rock and Ward's Island, and just about as the master of the Morse was directing his course to take such channel he discovered a schooner navigating in such a manner as to prevent his going with safety in that channel; he then directed the course of the Morse as close as he could safely go to Hallett's Point and proceeded through the easterly channel between the Whitney and Hallett's Point; that the lighter Will was lying some distance south-easterly of Flood Rock and made a narrow and difficult channel for the tug and tow, and that without any fault on the part of the Morse the barges in the tow collided with libellant's lighter or derrick and caused the injury mentioned in the libel. That reasonable diligence and skill were used by the master of the Morse in his attempt to avoid the Whitney and the lighter, but because of the wind and strong ebb tide and the narrowness of the channel it was impossible to navigate safely under the extraordinary circumstances, in which the navigator of the Morse did all that could be reasonably done to avoid libellant's lighter.

. This respondent alleges that the position of libellant's lighter was a menace to navigation; that no warnings or signals were given to indicate the position in which the lighter lay, and this respondent upon information and belief alleges that the libellant permitted its lighter to remain a menace to navigation for an unreasonable time, and that the removal of the cargo or other necessary work within the permit from the Supervisor of Anchorages was unreasonably delayed."

It appears that the Whitney, while proceeding in a thick fog at a speed of about 6 knots an hour, ran ashore on Negro Point on Ward's Island on the night of May 23, 1908. Subsequently, on the same night, she got off and backed down past Hallett's Point. Her engines were worked ahead and astern. She brought up on Flood Rock and lay stranded almost directly across the channel nearly midway between Hallett's Point and Mill Rock, heading about north or north by east. Her position as she lay stranded left a channel of navigable water of something from 350 to 400 feet between her stern and the Astoria shore and a channel space of about 300 feet between the stem and Mill Rock.

Before the removal of Flood Rock, there was a channel which was occasionally used between that rock and Mill Rock, and although

there was some testimony in this case tending to show that the space was still available, the general concurrence of the opinions of experienced navigators was that with the Whitney lying as she was, the space could not be safely used. Therefore, there were two channels open to vessels navigating through the Gate at the time of this accident, the one between Hallett's Point and the Whitney, and the one between her and Ward's Island.

The New York and Boston newspapers noticed the accident to the Whitney but none of them, except the Boston Sunday Post of May 24th, 1908, came to the attention of those on the Morse, and that specifically stated that the Whitney had gone ashore on Negro Point, Ward's Island. The Morse left New York the same day the Whitney went ashore, about 2 p. m., with a loaded tow of barges, two for Boston and one for Newport. After delivering the Newport barge, she proceeded to Boston. Nothing had been heard of the stranding of the Whitney previous to her arrival in Boston, where the master happened to see the notice in the Post above alluded to. If the master had looked for other information, he probably could have found it but I do not see that he was under any obligation to search for the details of the stranding.

The Morse left Boston for New York May 29th, with the barges Caducia, David Wallace and Liberty in tow. At Newport she picked up the barges Pilgrim and Delhi. She reached the vicinity of Whitestone the 2nd of June with the 5 barges mentioned, which were then bunched up and the tow shortened, so that the distance between the tug and the first tier of barges, consisting of the Liberty, the David Wallace and the Caducia, was 25 or 30 fathoms. There were two hawsers running from the stern of the tug to the outside barges. The remaining barges, the Pilgrim and the Delhi, were placed in the stern tier and made fast with hawsers 25 to 30 feet in length. The stern tier was arranged so that the barges tailed behind the barges of the head tier in about the center, that is the Delhi, the starboard barge, when the tow was straight, was behind the Wallace and the Caducia, but did not extend as far to the starboard as the Caducia. The whole length of the tow from the stem of the tug to the stern of the last tier was from 775 to 800 feet. The width of the tow at its widest part was about 106 feet.

There was no communication with the shore at Whitestone. At Sunken Meadows the tow was slowed down, maintaining just enough headway to keep steerage way on the barges, and a long whistle blown by the tug for the channel bend. The tow before the slowing was going through the water about 5 miles an hour. The current was running 3 or 4 miles an hour. In the Gate it was running faster, probably 5 or 6 miles an hour. On approaching Negro Point, the tow was going at the rate of 2 or 3 miles in addition to the tide, which made her headway over the bottom about 8 or 9 miles.

The Morse approached Negro Point, where she expected to find the Whitney, somewhat to the southward of mid channel. On failing to see the Whitney there, the master of the Morse thought she had been removed. When, however, the Morse was about opposite

the wharf east of Negro Point, the Whitney was sighted lying across the channel on Flood Rock. This was the first intimation he had of her being in such a position.

He intended on rounding Negro Point to pass through the channel between Mill Rock and Ward's Island. The tail of the tow swung around as usual on an ebb tide toward Potts Cove. The Morse passed a ferryboat port to port between Hallett's Point and the Cove and ported her helm somewhat to allow the ferryboat more room.

Shortly after passing the ferryboat and also after rounding Negro Point so that the channel between Mill Rock and Ward's Island was fully opened, it was seen that a small schooner was standing down the channel, near the middle, in a southeasterly direction toward Negro Point and was then in a position about half way between Mill Rock and Hog's Back. The wind was then blowing from the N. W. with a force of about 24 miles an hour. The sails of the vessel were on her starboard side and she was making some leeway.

The master and the mate of the Morse, who was also in the pilot house, consulted as to the best course to pursue under the circumstances and it was concluded that if the Morse attempted to pass between the schooner and Ward's Island, the tow would swing over on the tide and sink the schooner, while if an attempt should be made to pass between the schooner and Mill Rock, the westerly set of the current would carry the tow on the Rock. It was accordingly decided that the best and only chance of safety was to go as close as possible to Hallett's Point at full speed in the hope that the tow could be pulled past the stern of the Whitney before the set of the current could force it on the wreck. The helm of the tug was therefore hard-a-starboarded when they were in a position to the southward and eastward of Hallett's Point. Her stem was kept as close to the tide rip near the Hallett's Point shore as was safe and practicable and every possible effort made to haul the tow quickly through the narrow channel. The strength of the current was too great, however, for the success of this attempt and its force swung the tow nearly broadside against the Will and the Whitney as the head barge was about to pass the bow of the Will. The barge in the head tier, the Caducia, damaged the front end of the lighter and the Delhi, in the stern tier, came up against the side of the Whitney and struck the Will at the stern, from the effect of which the latter capsized and dumped her load. It was about 3 minutes from the time the Whitney was first located until the collision occurred.

It is provided:

"That it shall not be lawful to tie up or anchor vessels or other craft in the navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft. * * *" Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543).

The permit, quoted in the answer, was granted in conformity with the authority vested in the Secretary of the Treasury (Commerce and Labor) by Act May 16, 1888, c. 257, 25 Stat. 151 (U. S. Comp. St. 1901, p. 3549). The Rules and Regulations issued under this authority provide:

174 F.—46

"(b) No vessel shall anchor in any of the channels except in cases of great emergency, and then as near the edge of the channel as possible, so as not to impede or interfere with the free navigation of the same, and only until such time as they can procure assistance; and no vessel shall anchor so as to obstruct the approach to any pier or impede the movement of any ferryboat."

\* \* \* \* \* \* \* \* \* \* \* \*

"(e) Permits may be granted by the supervisor of anchorages to wrecking plants to anchor in the channel for the purpose of recovering sunken property, subject to his supervision. Such wrecking plants must comply with all the navigation laws in regard to lights, fog signals, etc., and in granting such permit the Government assumes no responsibility."

The Plate of the permitted anchorages grounds shows that there is none at the place of collision.

The question of the effect of anchoring vessels under the foregoing acts was considered by Judge Brown in The Chauncey M. Depew (D. C.) 59 Fed. 791, and he held that it is obligatory upon the owner to raise vessels and that a derrick engaged in raising a sunken vessel in the channel way of the East River, although not unlawfully in her position, was not entitled to all of the immunities of vessels anchored on anchorage grounds. He did not consider the effect of the later statute, supra, but no doubt where a permit is issued, a wrecking plant can lawfully occupy part of a channel. Following the Depew case, I recently held in The James McWilliams (C. C. A.) 172 Fed. 919, affirmed on appeal, that a lawfully anchored derrick was entitled to damages from a tug whose tow collided with it because of the lack of ordinary skill and care.

It does not seem, however, that any presumption of fault arises from a collision under the circumstances of a case of this kind. The Whitney was, in a sense, authorized to occupy the channel but the mere fact of her being anchored or stranded in the channel did not create any presumption against the Morse as a moving vessel, or to relieve the Whitney of any precaution to advise navigating vessels of her presence in the channel.

The libellant understood that it was under an obligation to warn navigating vessels of her situation and she sought to do so by giving whistle signals but it appears that the signals were not given in time to be of any service because when they were sounded the Morse was already in a dangerous position and there was nothing she could do to extricate herself. No warnings reached the Morse until after she had rounded Negro Point and was in a position between it and Hallett's Point, entirely too late to be of any service to the Morse in avoiding the collision.

The fact that the Morse was unable to navigate her tow through the channel in safety is not evidence of any want of care on her part. While the vicinity was navigated in safety by vessels and smaller tows, there was nothing to show that any other tug, under similar conditions, had succeeded in doing what she failed to accomplish.

It does not appear that any of the numerous charges of fault against the Morse have been sustained. That of want of lookout has been urged but when a lookout could have seen the obstruction, the Morse was already in a precarious position and the services of a most vigilant person acting in that capacity would not have been of any avail.

The charge that the Morse had "too large and unwieldy a tow" is true in a sense but all hawser towing is subject to that criticism and it is too late now to attempt to place a tug in fault upon such ground. The charge that she was "towing through the Gate with too long a hawser" has not been proved. The testimony is uniform that the tow was made up in the customary manner. The charge that she was in fault in that she had "no competent officers, properly acquainted with the locality and the salvage operations" is not established. The master was a man of long experience and the mate was a licensed man, also of considerable practice in towing of this kind. They were not advised of the salvage operations. The question of lookout has been mentioned above. As soon as the conformation of the land permitted a view of the Morse, she was seen by the master and the mate. This also disposes of the charge of "not seeing the Whitney as soon as she should have been seen." The charge that the Morse was in fault in "not making sufficient allowance for the currents and set of the tide," in "not keeping her tow clear of the salvor's plant in plain view" and in "not taking reasonable precautions to pass" have been disposed of above, as has the further charge of fault in "not slowing or stopping sooner so as to moderate the violence of the contact." It is obvious that in towing on a hawser in a strong current, running in the same direction in which a hawser tow is proceeding, stopping and reversing would be of no avail to avoid a collision or to mitigate its force. The Morse's best chance in the situation in which she found herself was to proceed as fast as possible to pull her tow away from the Whitney.

The principal cause of the collision was the presence in the channel of the navigating schooner. It has been strongly urged that she was not actually there and testimony on the part of those on the wreck and surrounding vessels that they did not see her has been cited to establish such fact, but it seems to me that it is amply proved that she was there and obstructed the channel the Morse desired to take. This was shown not only by the testimony of the navigators of the Morse but by several independent witnesses on the tow. It was testified that she was a schooner with two masts, painted a dark color; that she looked like a fishing built vessel but was not equipped with dories; that she was of American type but apparently hailed from Nova Scotia; that she was from 80 to 100 tons burden, deep loaded and was drawing from 13 to 17 feet; that her sails were on the starboard side and she was sailing through the Gate, stemming the tide and making some leeway; that she was heading in a southeasterly direction and pointing right down the channel toward Negro Point; that her speed over the bottom was 3 or 4 miles, making good headway; that she had all of her lower sails and main gaff topsail set but had no fore topmast. All of these particulars were noted by the respondent's witnesses and there is nothing on the other side except the negative testimony of its witnesses, who were not especially looking out for anything of the kind and the fact that they failed to observe her can have little effect in view of the positive statements of the respondent's witnesses.

The collision would doubtless have been avoided if the tow had been permitted to use the channel between the Whitney and Ward's Island but then that was blocked by the schooner, the collision, as it turned out, was unavoidable.

The libel is dismissed.