THE SEA KING. THE NANTICOKE. NEPTUNE LINE, Inc., v. P. DOUGHERTY CO. P. DOUGHERTY CO. v. NEPTUNE LINE, Inc.

(District Court, S. D. New York. April 5, 1926.)

1. Collision ⬦⟩73.

Where collision between anchored barges was caused by the last anchored dragging her anchors, she must establish her freedom from fault.

2. Collision ⬦⟩22—Inevitable accident applies only when both vessels have exercised every care in their power to avoid collision or when storm causing dragging of anchor was sudden beyond anticipation.

In such case inevitable accident applies only where both vessels have exercised every care to avoid the collision or where the storm which caused the dragging of anchor was so sudden and unexpected that it could not have been anticipated in the exercise of proper care and skill.

3. Collision ⬦⟩71 (3)—Anchored barge having out but one of her two anchors in a gale held in fault for collision with another caused by dragging her anchor.

An anchored barge which during a storm of which she was forewarned had out but one of her two anchors until after it began to drag, while others near, having out both anchors, did not drag, held in fault for collision with another barge against which she drifted.

4. Collision ⬦⟩71 (1)—Tug held in fault for collision between barges in her tow, anchored during a gale.

An ocean-going tug left her tow of barges anchored for 36 hours during a gale of which she was forewarned, staying herself in a nearby harbor. During the gale one of the barges dragged her anchor, drifted for 1,000 feet, and came into collision with another barge. Held, that failure of the tug to look after her tow, which she could have done without danger to herself and which would have prevented the collision, was a contributing fault.

In Admiralty. Suit for collision by the Neptune Line, Inc., owner of the barge Sea King, against the P. Dougherty Company, owner of the barge Nanticoke, with cross-libel. Decree dividing damages.

Foley & Martin, of New York City, for libelant.

Bigham, Englar & Jones, of New York City, for respondent.

GRONER, District Judge. This is a libel on behalf of the Neptune Line, Inc., owner of the barge Sea King, against the P. Dougherty Company, owners of the barge Nanticoke. By agreement of the parties, a cross-libel filed on behalf of the Nanticoke against the Neptune Line, Inc., as owner of the tug Neptune, was heard at the same time.

The evidence shows that the Neptune Line, Inc., contracted with the owners of the barge Nanticoke to tow her from Providence to Norfolk. At 7 o'clock on December 28, 1922, the barge was taken in tow by the tug Neptune, and at 9 o'clock of the same date was anchored off Jamestown, R. I., in about 15 fathoms of water. At the time she was anchored, storm signals indicated the approach of a very severe storm. The barge Sea King, also belonging to the Neptune Line, was at that time anchored about 1,000 feet astern of the Nanticoke. When the Nanticoke was anchored there was another barge alongside the Sea King, but when the storm began about noon this barge dropped astern of the Sea King 200 or 300 feet and came to anchor somewhat closer to the Jamestown shore. Immediately after the Nanticoke was anchored, the tug Neptune left her, docked at Newport, and continued there until ordered by her owners to proceed to New York without the barges. In the meantime the storm continued to increase, and by late afternoon was blowing with gale force, having attained the maximum velocity of 63 miles. The Nanticoke, although equipped with two anchors, had out but a single anchor, and those aboard the Sea King in the late afternoon observed that she was gradually coming down. The master of the Nanticoke continued to pay out his anchor chain, and, a little after dark, his other anchor was cleared on 45 fathoms of chain. In spite of this, however, the Nanticoke continued to drift down under the continuing pressure of the storm until she brought up alongside the barge Sea King, where she lay, both barges yawing back and forth and hitting one other, until the storm abated the following day.

[1-3] There are two questions to be decided, first, whether the damage done to the barge Sea King by contact with the Nanticoke was due to the fault or neglect of those in charge of the Nanticoke; and, secondly, and on the cross-libel, whether the damage sustained to the Nanticoke was due to the negligence of the tug Neptune in anchoring her in an exposed place or in not returning to her assistance when the storm increased. As between the barges Nanticoke and Sea King, the Nanticoke being the last barge anchored, and the evidence establishing clearly that the collision was due to her dragging her anchors, it follows necessarily that she must establish freedom from fault on her part to escape liability. Inevitable accident under such circumstances applies only where both vessels have exercised every care in their power to avoid the collision, or where the storm which caused the dragging was so sudden and unexpected as in

the exercise of proper skill and care could not have been anticipated. The evidence in this case establishes, I think, beyond any real controversy, that the masters of all the barges anchored in this locality had due notice of the approaching storm, and all of them, in anticipation of its effect upon their vessels, except the Nanticoke put both starboard and port anchors overboard. Although the storm attained to gale force, none of the barges, except the Nanticoke, changed position or dragged, and, while it is true her position was somewhat more exposed than the others, the effect of this was negligible, and the real cause of the collision was the reliance by her master on one anchor until she had begun to drift, when the assistance of the second anchor was rendered far less effective. I think it was the duty of the Nanticoke to have anticipated the trouble that ensued and to have avoided it by putting out both anchors when the storm began, and that it was fault on her part to have delayed putting over her second anchor until the other anchor had lost its hold and force, and she was drifting down on the Sea King. As the evidence fails to show any fault on the part of the Sea King causing or contributing to the collision, it follows that, as between the two, the Nanticoke should be held solely at fault; and this makes necessary the consideration of the liability, if any, of the tug, either in the anchoring of the barge, or in failing to come to her aid.

[4] The master of the tug had notice of the approaching storm. He knew that it was dangerous to proceed on the voyage to Norfolk, and his act in not attempting it was entirely proper and is not the subject of any criticism. Whether he should have anchored the Nanticoke and the other barges in his tow in the open roadstead off Jamestown Island, or whether he should have endeavored to find a more secure place nearer Newport, was the occasion of considerable evidence on both sides. I am disposed to accept the reasoning of the captain of the Neptune on this subject, and I believe, under the circumstances, the place selected by him was in all respects as safe a place as was available. No negligence, therefore, may be imputed to the tug in placing the Nanticoke at her original anchorage.

A much more serious question arises, however, as to the duty of the tug after this was accomplished, and particularly in view of the knowledge of her master of the approaching storm and of the prediction of the weather bureau that it would assume the proportions of a "whole gale." The evidence discloses that, after he anchored the barges, including the Nanticoke, he sought shelter in the inner harbor at Newport, and there he remained until ordered by his owners to New York. There was no danger to his vessel in returning to the barge. The Neptune is a seagoing tug, and could either have remained with the barges or returned to them without the slightest risk, even at the height of the storm. When it was observed by those on the Sea King that the Nanticoke was dragging and would soon be down upon them, they sounded distress signals, and the master of the Nanticoke, being without that means of attracting attention to his situation, hoisted distress signals at his mast. In spite of all of this, the Nanticoke was allowed to drift down slowly on the Sea King and to lay alongside, with the resulting damage to both vessels inevitable in a heavy sea and a strong wind, and it was not until the storm had wholly abated, some 36 hours after the anchoring, if I recall the evidence correctly, that assistance came. I cannot excuse or condone this disregard of its duty by the tug and her owners. As was said in the case of Maryland Transp. Co. v. Dempsey (C. C. A. Fourth Circuit) 279 F. 94:

"The duty owed by a tug to its tow is well settled, and while a tug is not the insurer of its tow, nor has the duties of a common carrier imposed upon it, it is nevertheless charged with the exercise of reasonable and ordinary care, caution, and maritime skill in and about the service undertaken, and for omissions in this respect, liability follows."

Further on in the opinion in the same case Judge Waddill, speaking for the Circuit Court of Appeals, under circumstances not dissimilar to those existing in this case, says:

"Tugs owe a high degree of diligence to look after lives and property committed to their care, when, from force of circumstances, the tow is set adrift, or has to be cast off, or even temporarily abandoned. The obligation to stand by should be strictly observed, as long as it is reasonably safe and proper to do so. The duty of the tug to return at the earliest moment, and vigorously attempt to care for those in danger and distress, who cannot get away because of lack of motive power, is manifest, as well from the relation they occupy to the tug as from the plainest sense of humanity. Failure to do so constitutes negligence, and for losses resulting therefrom there is liability on the tug, especially where it appears that the loss and damage might have been avoided by the proper discharge of those plain obligations."

See, also, Appeal of Cahill, 124 F. 63, 59 C. C. A. 519 (C. C. A. Second Circuit) in which the court said:

"Even if the circumstances had been suffi-

cient to justify the master of the tug in cutting loose from the dredge in order to take off the men, they did not justify him in deserting her and her scows, and allowing them to be beached without any effort to save them. We are satisfied there was a reasonable chance that they could have been saved if the tug had resumed charge of them. Their owner was entitled to the benefit of the chance, and as he has been deprived of it by the conduct of the tug, in disregard of her duty to use all reasonable efforts for the preservation of her tow, the tug must respond for the consequences, in the absence of clear proof that her efforts would have been ineffectual."

The conclusion I have come to is that, while the tug was justified in anchoring her tow, she owed the duty of care and foresight in seeing that no damage occurred which she could prevent in the exercise of that care which the law imposed upon her. She should have returned when the storm increased from a comparatively easy breeze to a strong gale. If she had returned, she could easily have prevented the mischief. Her failure to do so, and the act of her owners in sending her somewhere else, without explanation or excuse, and wholly without justification, created fault on her part for which she should be held responsible. At the same time, since, as I have already said, the resulting damages would not have occurred except for the negligence of the master of the Nanticoke in failing to put over his second anchor, it follows that the fault of the tug was not the sole and exclusive cause of the damage. I am not unmindful of the fact that the damage should be charged to the proximate cause, and that there can be, ordinarily, but one proximate cause; but that is not the case here. The negligence of both was continuing and contributory, and under such circumstances each should be held responsible.