## THE WILLIAM J. DICKEY.

## THE NO. 187.

## THE BLACK GULL.

## BALTIMORE & O. R. CO. v. AMERICAN DIAMOND LINES, Inc., et al.

## AMERICAN DIAMOND LINES, Inc., v. STANDARD–VACUUM TRANSP. CO.

### Nos. 13959, 13975.

District Court, E. D. New York.

May 31, 1934.

Lynch & Hagen, of New York City (Henry C. Eidenbach, of New York City, of counsel), for libelant B. & O. R. R. Co.

Hunt, Hill & Betts, of New York City (John W. Crandall and Frank J. Zito, both of New York City, of counsel), for claimant and libelant American Diamond Lines, Inc.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), for Standard-Vacuum Transp. Co.

BYERS, District Judge.

All hourly references herein are to daylight saving time.

At about 9:11 p. m. on July 1, 1933, the S. S. Black Gull, running light, was proceeding easterly through the Kill Van Kull, bound for Weehawken, and came to anchor during heavy weather off the B. & O. piers 6 and 7 at St. George, Staten Island. In that position, she was caused, by the force of the wind against her port side, to sag broadside to against a carfloat off pier 5, and then over against pier 6, and carfloat #187 made fast at the end of that pier, thus causing the damage for which the libel was filed in the first cause. The owner of the steamer made claim, and impleaded the owner of two Standard Oil barges which were at anchor in the fairway, and filed a separate libel against the same corporation, to recover for the damages suffered by the steamer, in the second cause.

The theory upon which these two pleadings rest is that the presence of the barges caused the steamer to come to anchor to avoid colli-

sion with them, and thus to sag down upon the properties of the first libelant.

It becomes important to seek to discover the position of the barges, and the effect of their presence upon the maneuvers of the steamer, and whether in any case the barges are shown to have been at fault.

The weather conditions prevailing between 8:45 p. m. and 9:15 p. m. should be briefly described. At about the earlier time, a rain began to fall which rapidly became so heavy as to constitute a curtain which reduced visibility in all parts of this area to from 50 to 100 feet. The sky became black, and there was thunder and much lightning, and the wind rose rapidly to a velocity of 69 miles an hour, and the consensus is that it was of a force of about No. 9 on the scale. It seemed to veer between the northeast and northwest, so that there is no certainty in the testimony on that subject, but probably its greatest force was from the northeast.

These conditions succeeded a number of hours of fair, clear weather, during which a light southwest breeze had been blowing. In other words, it was a typical summer evening in these parts.

The mean temperature starting at 12:01 a. m. was 80°, with the highest at 90° between 5:00 and 6:00 p. m., which fell slowly to 86° between 8:00 and 9:00 p. m.

The humidity was 95 at 1:00 a. m., and fell to 44 between 2:00 and 3:00 p. m., and gradually rose to 50 between 5:00 and 6:00 p. m., 58 in the next hour, 64 in the next, and to 73 between 8:00 and 9:00 p. m.

Sunset was at 8:32 p. m., and was cloudy.

The weather report states that the oppressive heat of the day came to an end in the evening when a violent thunderstorm swept the city. "During the squall which lasted only 10 minutes the wind suddenly attained an extreme velocity of 69 miles per hour causing damage. * * * Lightning was especially intense and fired an oil plant in Elizabeth, N. J. After the gale rain fell at the excessive rate of one inch an hour."

From 6:00 to 9:00 o'clock, the sky was partly cloudy.

The handling of the oil barges is to be considered in the light of what should have been done under the conditions shown to have prevailed.

During these hours the tide in the Kills was ebb, and is understood to have affected all vessels involved.

The oil barges were numbers 111 and 12 of the Socony-Vacuum fleet, and they were light when anchored in their anchorage grounds off Constable Hook at 6:35 p. m. They were made fast securely, side by side, with double bow and stern 6 inch lines and 5 inch spring lines, with #111 to port, heading toward Constable Hook; that is, the #111 was nearer St. George. A 2,000 lb. anchor was dropped from the bow of #12, and they tailed in the tide on 30 fathoms of anchor chain, toward the east. The depth of water was 18 feet at this place.

Under the conditions then prevailing, this is found to have been a proper and customary way of anchoring the barges, and there is no evidence to the contrary.

#111 is 251.5x40 feet, and #12 is 225x 36.1 feet, and their bows were flush. The former is rounded fore and aft, and the latter has square ends. The barges were of about 9 feet freeboard as they lay at anchor. Each had two men on board, the Captain as to #111 and a deckhand, and the mate and cook as to #12.

On each barge, a bow and stern light, i. e., a ship's lantern, 8 inches in diameter, burning kerosene, was lighted and hoisted into position shortly after 8:00 o'clock. The lights were proper and adequate, and, in position, were about 25 to 30 feet above deck. This was done as darkness began to fall, around 8:30 o'clock.

At that time and during the succeeding quarter hour, there was no reason to suspect that events of more than passing moment were in the making. At about 8:45 p. m. rain began to fall, with rapidly increasing intensity, as has been stated. The bargees started ringing bells as soon as they realized that the rain was interfering with visibility. The wind began to blow with great force, and in a short time the Captain of #111, suspecting that the barges were or might be drifting, let go his port bow anchor of 2500 lbs., and in a short time the barges came to rest and rode out the storm without further incident. During the time that the storm was at its height, one light on each barge blew out, or was put out by the rain, but a bow light on one and a stern light on the other weathered the squall. The bells on the barges were kept ringing, but probably could not be heard in the storm.

It is difficult to state where the barges fetched up on the second anchor, but it was generally off B. & O. pier 6, and the distance is stated variously at between 250 and 800 feet therefrom.

The place of original anchorage is from the B. & O. pier 6 a stipulated distance of

2,475 feet, so that the barges drifted not less than 1,675 feet, and not more than 2,225 feet.

This must have been accomplished between about 8:50 and 9:13 p. m. and in a southerly direction, from which it is possible to gather that the force of the wind was high and sustained, and that it was generally from the north.

The Captain of the #111 saw a ship 100 feet or so off the barges, during a flash of lightning, but could not tell if it was the Black Gull. This decision is based upon the belief that it was, but whether the barges were drifting at the time cannot be stated.

The Black Gull had been proceeding through the Kills, as stated, and was supposed to be headed for Robbins Reef when the squall struck; she had encountered light rain at Bayonne, which soon became heavy.

The record of her engine room bells shows that at 8:36 p. m. she was proceeding full ahead; slow at 8:41; full ahead at 8:44; slow at 8:46; stop at 9:07; full astern 9:07; half ahead at 9:10; stop at 9:11; slow astern at 9:12; shock at 9:13.

Between her slow speed at 8:46 and stop at 9:07, she was feeling her way eastward along Baxter's Ledge; nearing Constable Hook to port, she was rather favoring the Staten Island side. It was during this interval that the storm was at its height, and the stop at 9:07 was caused by a tug and one barge on a hawser, which the ship's witnesses are convinced crossed ahead from port to starboard, and then from starboard to port, and which could hardly be made out except in the flashes of lightning. The full astern at 9:07 caused the ship to veer to starboard and apparently this brought her near the B. & O. coal docks, just west of piers 5, 6 and 7, and she then proceeded half ahead at 9:10, and the tide probably had carried her to a place off the latter when the engines came to a stop at that time. This was to avoid contact with the Standard Oil barges. The ship dropped her starboard bow anchor at this time, and her engines were put slow astern, which brought her heading about two points to starboard; the ship was broadside to the wind and was blown towards the piers, and, as has been stated, she struck a float at pier 5 and then her stern came around and struck carfloat #187 at or near the end of pier 6.

The ship asserts that, while there was no collision with the Standard Oil barges #111 and #12, it was their position in the fairway which caused the ship to come to anchor, and thus into collision with the B. & O. floats and pier.

The narrative has been somewhat abbreviated, but probably comprehends the important elements. Two aspects call for discussion: The ship's latest headings were more to starboard than her supposed course for Robbins Reef would warrant, because of her encounter with the unidentified tow, and thus she was brought into a position which she regarded as perilous with reference to the barges. They were probably lying broadside across her path, for the deckhand on #111 saw a steamer on his port hand, in a flash of lightning (but does not relate that incident to the dropping of the second barge anchor, or any other event whereby the time could be judged).

The nearer to B. & O. pier 6, the actual position of the barges when they had fetched on the second anchor, the more off her direct course the ship was, when she dropped her own.

The Standard Oil barges could not have been so close to B. & O. pier 6 as the pilot indicated on the chart "Dickey Ex. 1," in the light of what the first officer states to be the distance of the ship from the piers when the anchor was let go. He was on the forecastle head during the entire time involved, and says, incidentally, that the barge in the interfering tow was so close aboard (4 feet from the ship's stem, passing to port) that he let go the starboard rather than the port anchor.

There can be little doubt that the ship's heading, and perhaps her coming to anchor at all, were influenced by the proximity of the tow, and the culpability of the Standard Oil barges for the damage done by the Black Gull cannot be assigned with any degree of certainty merely because of the fact that they were caused to drift into the fairway under the conditions shown.

The testimony of the Master of the ship, who was on the bridge but not in charge of navigation, is that, if the weather had been clear, the barges could have been safely passed. To the same effect is the version of the pilot that but for the storm the ship could have gotten by the barges.

That was educed in reference to the proximity of the barges to the B. & O. piers, and the ability of the ship to pass clear in that space, having in mind that the ship is 401 feet long, with a 54 foot beam, and is of 5,029 gross and 3,124 net tonnage.

Such testimony seems to preclude a finding that the barges must be held at fault, because they were no more responsible for the storm which obscured the vision of those navigating the ship, than they were for the inter-

vening tow which caused the ship to change her true heading, or for their own presence remote from their original anchorage.

The location of the respondent's barges off B. & O. pier 6 was probably not less than 450 feet. The Black Gull paid out 25 fathoms of anchor chain from her starboard side before striking the carfloats and pier, so she must have dropped her anchor when somewhat more than 150 feet off the pier. In his report to the Local Inspectors, the Master put it at 450 feet. He estimated the barges to be 100 feet off his port bow at that time.

It is known that at the end of pier 5 there were five floats averaging 40 feet in beam, and outside of them a tug, of 15 foot beam, and these vessels accounted for 215 feet off the end of that pier. The Captain of that tug put the barges at 400 feet from him. Presuming that all these estimates were approximate, it is possible to arrive at the conclusion that the barges were between 400 and 500 feet off pier 6 when the Black Gull let go her anchor.

The fact is that she could have passed clear of the vessels at the end of pier 5 and the Standard Oil barges, and swung around to port to resume her course; or she could have passed north of the barges as they lay, had she not changed her heading as has been stated, between Baxter's Ledge and the B. & O. piers. The election to come to anchor cannot be said to have been compelled by the barges, but by the lack of visibility which was what interfered with the ship's freedom of maneuver.

If the foregoing is a correct analysis of the situation, the claimant must fail, unless the cases relied upon by it point to a different conclusion.

Merritt & Chapman D. & W. Co. v. Cornell Steamboat Co. (C. C. A.) 185 F. 261, 262: Here a tow struck and damaged a dredge lawfully alongside a stranded vessel in a frequented channel. The libel filed by the dredge was dismissed. The presumption of fault on the part of the colliding vessel was held not to avail under the facts, in behalf of the dredge.

From the fact that the tow had to veer into the collision apparently because her course was necessarily altered by a schooner approaching with a fair wind in the tow's original course, this claimant reasons that it should be exonerated for the damage done by it to the B. & O. floats and pier. But the latter invited no such hazards as did the dredge in the cited case. Thus the opinion: "In carrying on her business in this dangerous position, she (the dredge) took the risk of damage by collision with vessels navigating with care and skill. The Chauncey M. Depew (D. C.) 59 F. 791."

The libelant in the first cause took no risk of damage by any conduct shown in this record.

The Jack Hammond (D. C.) 41 F.(2d) 831, was a cause instituted by barges lying in a slip, which were struck by the S. S. Norfolk, coming up the East River, which was forced into the slip to avoid collision with a ferryboat crossing from New York to Greenpoint. The latter was the burdened vessel in a crossing situation, and did not navigate accordingly. The ship was at fault for proceeding at twelve knots with a tide under foot, and was allowed to recoup one-half of the damages to be assessed against her by the barges. In other words, the fault of the ferryboat was clear and unmistakable.

No fault is deemed to have been shown by this record on the part of the Standard Oil barges.

These are the two cases relied upon to sustain the claimant's impleading petition in the first cause, and are not thought to avail. The Black Gull could have anchored sooner than she did, or she could have continued on her course without striking the barges; therefore the libelant will have a decree in the first cause with costs, and the petition will be dismissed without costs.

The cases mainly relied upon in the second cause remain to be considered:

The Vera (D. C.) 224 F. 998: The schooner Baxter was held at fault for being anchored at the edge of or in the channel leading from Boston Harbor, and liable for damage suffered by her from being run into by the Vera outbound. The anchorage was deliberately chosen, and involved statutory fault within The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148. The fault in the latter case was the failure on the part of a bark to blow a horn in fog.

It may be conceded that the barges should not have been anchored in a navigable channel "in such a manner as to prevent or obstruct the passage of other vessels or craft" (title 33 U. S. C. § 409 [33 USCA § 409]) without proving fault in this case, because they were not anchored there initially, but only fetched up in such waters when a second anchor had been dropped in an emergency; and because the ship's testimony is that they did not obstruct navigation, but that the way to pass them was not observable because of lack of visibility caused by the storm. The effort has been made to demonstrate that the

intervening tow and the darkness resulting from the squall, combined with the heavy fall of rain, prevented the ship from observing her way to open waters, in the course upon which she was supposed to be heading.

There is a certain naïve inconsistency in the contentions of the Black Gull, that she should be held free from blame because of the severity of the storm and all its incidents, while the barges should be charged with fault in spite of them.

Cases involving the deliberate anchoring in channels, by vessels which plainly disregarded their duties, are not deemed to be in point. Nor one in which a barge was caused to go adrift through the overloading of a flotilla of such craft by the addition of a loaded canal boat whereby the mooring of the sustaining one of the original group was overstrained. Nor a case involving a drifting barge that broke from her insecure moorings, which were not strengthened in the face of storm warnings; to say nothing of one in which a libel was dismissed for laches.

The claimant urges that fault is to be attributed to the barges, first, because of the initial failure to use two anchors, in the face of an approaching storm.

 There was no storm approaching at 6:35 p. m., nor have storm warnings been proved. The forecast for July 1, 1933, referred to "local thundershowers tonight or Sunday; cooler Sunday." This cannot be interpreted as a warning of what actually took place.

 It is then argued that those in charge of the barges should have put out the second anchor immediately when the storm broke, instead of merely paying out more chain on the anchor from #12. That was done, but within a few minutes, from 2 to 4 according to the testimony, and, as soon as the severity of the storm became manifest, the anchor from #111 was let go. During that interval, both bargees were attentive, started ringing their bells, and stood to their duty. In the light of after-acquired knowledge, it becomes obvious that the delay, brief as it was, should have been avoided.

As the Master of the ship said, in explaining his own failure to anchor sooner: "Well, we dropped the anchor when we thought it was fit enough to drop it. After all, you see, you can think of a whole lot of things sitting at a desk but you cannot do that very well on the bridge; you have to take the circumstances just as they are."

The bargees were alert, competent men, and made a good impression as witnesses. Even ex post facto sagacity does not discredit their handling of a difficult situation.

Other cases relied upon by the claimant are the following:

The Sea King (D. C.) 14 F.(2d) 684: A barge, dragging anchor in a storm of which there had been warning, struck another and was held at fault. The specific warning is referred to in the opinion of the Circuit Court of Appeals. 29 F.(2d) 5, at page 7. There was nothing like such a warning in this case, and all that was said by the District Judge as to the applicable rule which visited liability upon the Nanticoke may be freely accepted without pointing to a similar responsibility upon the barges here involved.

The Severn (D. C.) 113 F. 578, 580, involved a collision between a bark and barge, both being at anchor, and the former having dragged in a sudden storm. In the first place, the damage was direct; that is to say, there was no room for discussion as to whether the barge was damaged by what was done or omitted by the bark. In the second place, the evidence of fault was clear and persuasive, thus: "The witness Drake and each of the expert witnesses examined by the Severn admit on cross-examination that it was not good seamanship to have been at anchor, under the circumstances, with only the port anchor out, and the starboard anchor not in position to be immediately let out."

Here there is no such evidence. The anchor on #111 was in position to be promptly let go, and was, as soon as the Captain of the barge realized that he might be drifting.

The Newa (C. C. A.) 267 F. 115: One ship dragged her anchor and struck another, also at anchor. The storm which caused the dragging by the first ship had been gathering for at least an hour, and the second ship had put out her own second anchor well before the accident. There were carelessness and inattention to duty on the part of the ship at fault, which could not be excused.

All of the other cases cited for the Black Gull have been examined, and involve facts which are quite remote from those under examination. For instance, in The Baltimore (D. C.) 265 F. 409, 411, the offending barge, which dragged her two anchors and struck the libelant's ship, had permitted a second barge to tie up to her, but that was taken away before the collision. The Court said in part: "The barge, if properly anchored, would have held her position. The Baltimore (the offending vessel) acquiesced in the arrangement whereby the other barge was moored to her stern. In moderate weather it might

have been unobjectionable; but at the time when the anchorage was made the wind was blowing half a gale, it was snowing, and a heavy sea was getting up. It was apparent that the two barges, so anchored, were likely to drag, and, being in a frequented anchorage, to endanger other vessels, if they did so. Upon all the evidence I find that the Baltimore was improperly anchored, and that this fault caused the collision." Even so, the steamer was held partly at fault, on appeal. Id. (C. C. A.) 283 F. 728.

The situation as above portrayed is so clearly to be distinguished from the one here involved that further comment is not required.

In the second cause, the conclusion is that the libelant has failed to sustain its burden of proof, and consequently the libel will be dismissed with costs.

Settle decree on notice.

If findings are desired, they may be settled at the same time, and are to embody appropriate recitals as to ownership and incorporation.