## THE ELWOOD.
### No. 364.

District Court, S. D. California, S. D.
Jan. 20, 1947.

Lillick, Geary, McHose & Adams and A. F. Mack, Jr., all of Los Angeles, Cal., for libelants.

Harold A. Black, George E. Toner and McCutchen, Thomas, Matthew, Griffiths & Greene, all of Los Angeles, Cal., for respondent and claimant.

YANKWICH, District Judge.

On January 22, 1943, between 11:30 p. m. and midnight, during an unusually severe storm, the Elwood, a kelp cutter 77.8 feet long and 27.9 feet wide and of 130 gross tons, broke from her usual mooring at Mc-Cormick Dock, in San Diego Bay, California.

In this libel in rem and in personam for collision, it is charged that the Betty L, a wooden fishing boat 59 feet long and 18 feet wide and of about 44 gross tons, safely moored, was struck, sunk and damaged by the drifting Elwood.

We are to determine the question of liability only. Such determination turns upon the question: Did the Betty L sink, as a direct result of the negligence of the crew of the Elwood, which resulted in a collision between it and the Betty L?

The problem involved must be approached with the fundamental rule in view that any collision caused by a vessel drifting from her moorings and striking another vessel, especially one moored in a proper place, throws upon the moving vessel the burden of showing that the exercise of reasonable nautical skill would not have prevented the accident. See 15 C.J.S., Collision, § 81; The Louisiana, 1865, 3 Wall. 164, 18 L.Ed. 85; United States v. King Coal Co., 9 Cir., 1925, 5 F.2d 780, 783; The Buffalo, 2 Cir., 1932, 56 F.2d 738; The Havana, 2 Cir., 1937, 89 F.2d 23; The President Madison, 9 Cir., 1927, 91 F.2d 835; Carr v. Hermosa Amusement Corp., Ltd., 9 Cir., 1943, 137 F.2d 983, 985; The Chickie, 3 Cir., 1944, 141 F.2d 80. However, this norm merely raises a prima facie presumption of fault to be overcome by proof that measures dictated by good seamanship were taken. It does not relieve a libelant of the duty of proving that the drifting vessel caused the damage of which he complains. I am of the view that the libelants here have failed to meet this burden.

There is no credible testimony that the Elwood actually collided with or struck the Betty L. On the contrary, the physical facts and the condition of the Betty L after the accident negative collision.

The vessels were alongside each other not more than two or three minutes and no contact was seen, and no sounds denoting a heavy collision or resulting breakage were heard by those near. The damage to the Betty L could have resulted only from a severe impact. She had a hole eight inches in diameter above the water line on the port quarter, in the stern, and a jagged hole about 24 inches in diameter below the water line on the port side.

But, assuming that an inference of damage by collision can be drawn, I am of the view that the presumption arising from the drifting of the Elwood has been fully overcome by positive evidence that not only were her lines adequate to hold her, but also that, *as a fact,* they *would have held,* except for the fact that they were broken by a drifting, uncompleted mine sweeper, some 130 feet long, which had been broken loose from her moorings by the high wind.

Under the circumstances, the Elwood cannot be held liable for the intervention of a cause,—the drifting mine sweeper which its crew could not reasonably anticipate. See The Anna C. Minch, 2 Cir., 1921, 271 F. 192; Courtney v. Walker, 4 Cir., 1928, 26 F.2d 583; The

Golden Rule, D.C.N.Y., 1919, 1925 A.M.C. 297; affirmed in The Golden Rule, 2 Cir., 1922, 278 F. 1021; The Cathlemet, D.C.N.Y., 56 F.Supp. 508; Petition of Pennsylvania R. Co., D.C.N.Y., 1942, 44 F.Supp. 617. The evidence shows beyond dispute that the Elwood was moored to the leeside of the McCormick dock with a series of stern and bow lines, which were the customary mooring lines. The crew of the Elwood, throughout the day of the storm, put out additional lines. Two 7/8" cables were clamped to the two 7/8" cables on the port bow and, the ends were run through a bridle and along the easterly side of the pier for some 115 feet to another bitt. The short 7/8" cable from the port stern was moved from its bitt and to it was spliced a length of 2½" Manila hawser to cross the pier. Together, these lines,—some twelve in number,—were adequate to hold the vessel, even in the extraordinary storm which followed. The testimony of the crew of the Elwood, which was supported by the expert opinion of the marine surveyor, K. M. Walker, compels this conclusion.

It is conceivable that if there had been no intervening cause to break the lines, it could be argued that this evidence should be disregarded in the face of an uncontroverted fact,—*the actual breaking of the lines.* But, to my mind, the conclusion is inevitable that the simultaneous breaking of the bow lines of the Elwood and its consequent drifting were caused by the mine sweeper.

Libelants assert that the movements of the mine sweeper, as described by Captain John O. Hatton, of the Elwood, "touched upon the realm of whimsy". I do not think that this evidence merits such characterization. This mine sweeper, of large proportions, was not a "phantom", the actions of which exist in the imagination of Captain Hatton. It was *very much of a reality.* If its doings seem erratic, it is because "mighty" man is incapable of predicting accurately what a combination of wind and sea will do to physical objects of his creation. The testimony of Captain Hatton is that the mine sweeper struck the dock forwards of midship, made a complete turn until the stern was against the dock.

So doing, the stern of the mine sweeper came in contact with the end of the dock and turned until the bow came back in between the dock and the Elwood. When the mine sweeper came into that position, all the lines of the Elwood parted, turning her loose. These actions may seem astonishing to counsel. They seemed so even to men of the sea, other than Captain Hatton, who saw the mine sweeper at the time, and to whom it was a source of anxiety. Yet they took place. Captain Oakley J. Hall, the president of the boat company which was building the mine sweeper, testified that the actions of the mine sweeper caused by the storm and the heavy sea were "surprising" to him.

"Q. Do you have any explanation why the vessel didn't follow the direction of the wind exactly? A. As I have said, it was a great surprise to me that she got by McCormick's wharf; I couldn't see how it was possible, but the vessel was very light, and she has a high forecastle and I believe she must have got headed just in the right direction and sailed out on a tack that took her by the McCormick wharf.

"Q. *In other words, she behaved in a rather eccentric manner?* A. *Very surprising.*" (Emphasis added.)

Captain Hatton's testimony that the drifting mine sweeper caused the simultaneous severance of all the Elwood's bow lines is not contradicted. He was closer to both the mine sweeper and the Elwood than any one else. Not only James Samson and Charles Adair, members of the Elwood's crew, but the libelant's chief witness, Chancy R. McFadden, saw the looming, gray hull near the dock and in the vicinity of the Elwood. Samson and Adair actually saw the mine sweeper strike the dock, as did Hatton. Hatton's narration of what occurred, made to Leland O. Pratt, the respondent's executive, almost simultaneously, on the night of January 22, 1943, accords with what he wrote in his log book the morning following the accident, when he had the first opportunity to make the entry, and with his testimony at the trial. And McFadden testified, in answer to a question asked by the court, that he saw the mine sweeper near the Elwood just after her lines had parted and she had begun

to drift. From his position, he could not tell whether actual contact had taken place between the mine sweeper and the Elwood.

Physical facts come to our assistance here.

The port draper of the Elwood was broken at the point where the bow of the mine sweeper must have come in contact with her, after it made the complete turn against the end of the dock. And the damage on the port side forward of the mine sweeper, which Walker, who surveyed her, attributed to "chafing up against some hard object", is an added fact which confirms the conclusion that the mine sweeper struck the Elwood. *The parting of the lines followed.*

█ Repeatedly, in cases of this character, courts must choose between the testimony of persons *who saw* things happen and others who *did not*. Always they will accept the version of persons who looked and saw, rather than of those who failed to look or did not see.

As said in The Richmond, D.C.Va., 1902, 114 F. 208, 211: "This positive testimony by those on the schooner, *in a position to see the lights,* and know of their condition, *will not be lightly rejected because other persons, whose duty it was to have seen them, either failed to observe, or happened not to see them.* Negative evidence of this character cannot be accepted to outweigh positive evidence. *The failure to observe a light cannot be said to disprove its existence.* Stitt v. Huidekopers, 17 Wall. 384, 21 L.Ed. 644; The Thingvalla, 48 F. 764, 1 C.C.A. 87; The Michigan, 63 F. 280, 11 C.C.A. 187; The Alice B. Phillips, 81 F. 415, 26 C.C.A. 467; Green v. Compagnia Generale, 102 F. 650, 42 C.C.A. 580." .

These views, expressed by District Judge Waddill, were later adopted by the Circuit Court of Appeals for the Fourth Circuit, of which he became a member, in Courtney v. Walker, 4 Cir., 1928, 26 F.2d 583, 585. In that case, the court declined to approve the findings of the trial judge who had disregarded *the positive testimony of witnesses as to the ramming of a scow,* saying:

"The judge below found that the Dorothy did not strike or ram the scow A5, and in this conclusion we cannot concur. Two witnesses testified positively that the Dorothy did strike the A5; the bow of the Dorothy was damaged, and no witnesses testified directly to the contrary. The captain of the Dorothy and a number of other witnesses did not swear positively that the Dorothy struck the A5, but were of the opinion that she did, and we are at a loss to understand how any conclusion could be reached from the evidence to the effect that the Dorothy did not strike the A5.

"Judge Waddill, of this court, while on the district bench in The Charlotte, D.C., 124 F. 989, affirmed by this court in 4 Cir., 128 F. 38, and in The Richmond, D.C., 114 F. 208, ably discusses the question of positive evidence as weighed against negative evidence, and lays down the rule that 'positive evidence of witnesses who hear a sound or see an object is entitled to greater weight than the negative evidence of persons who failed to see or hear the same. *The failure to hear a signal cannot be said to disprove the fact that it was given, and this is strikingly true as to witnesses on board the vessel at the time, who heard the signals given.'* " (Emphasis added.)

So here, the direct testimony of the witnesses who traced the severance of the Elwood's lines to the mine sweeper must be accepted, especially when the corroborative circumstances already referred to give added credence to it.

█ A study of the contentions of the libelant and of the decision rendered by the late Judge Harry A. Hollzer warrants the inference that fault is sought to be assigned against the Elwood on the theory that if a crew *had been put aboard and maintained* during the height of the storm, she *could have been* taken out into the Bay, as was done later when she was boarded from the Betty L. Captain Hatton, at the present trial, in answer to a question propounded by the court, admitted as much.

However, I do not think that this is decisive of the matter. And the reason is obvious. The Elwood, having been set adrift through *no fault of her own,* she can-

*not be held at* fault for the failure of her crew to anticipate the unpredictable. See The Sea King, 2 Cir., 1928, 29 F.2d 5; The Socony No. 115, 2 Cir., 1933, 63 F.2d 226; The Wm. J. Dickey, D.C.N.Y., 1934, 7 F. Supp. 308. As Judge William Denman said in The President Madison, 9 Cir., 1937, 91 F.2d 835, 841: *"Good seamanship does not require foreknowledge of unprecedented events."* (Emphasis added.)

■ The Elwood's crew were bound to take only those measures of safety *which the knowledge they had at the time called for.* This they did by watching her constantly, by putting out additional lines adequate to hold her in the unprecedented storm. They even attempted, without success, to put a crew aboard. The unexpected intervention of the mine sweeper resulted in the cutting of the Elwood's lines and its drifting. This untoward fact accounts fully for what occurred. And, as the Elwood had no reason to anticipate it or guard against it, fault and consequent liability cannot be fastened on her and her owners. More, any discussion of added precautions which might have been taken,— such as the placing of a crew aboard before the storm became as wild as it did,— becomes purely speculative.

■ These conclusions call for the following specific findings:

1. The Elwood was adequately moored to a dock, in its usual manner, and at its usual location, which the nature of the work it engaged in,—kelp cutting,—called for.

2. The libelants have not met the burden of showing that the sinking of the Betty L was the result of a collision between it and the Elwood.

3. The storm was of an intensity which could not have been anticipated.

4. The customary mooring lines of the Elwood and the additional lines put out by its crew were adequate to hold her securely, even in the unusual storm.

5. While the presence of a crew on board the Elwood would have avoided collision, assuming one occurred, the forseeable circumstances did not call for a crew on board.

6. The lines were broken by the mine sweeper, an outside intervening cause and force, which was unpredictable and could not have been reasonably anticipated by the Elwood.

Hence the conclusion that the Elwood, assuming that it sank the Betty L, was not at fault in any respect.

Decree is ordered entered for the respondents and claimant dismissing the libel, *without costs.*

Decree and findings to be prepared by counsel for the respondents and claimant under Local Rule 8.