MAROCEANO COMPANIA NAVIERA S.A. OF PANAMA, Libelant,

v.

CITY OF LOS ANGELES, a Municipal Corporation, Lee Weyant, and Crowley Launch & Tugboat Co., et al., Respondents.

UNITED TOWING COMPANY, a corporation, Libelant,

v.

THE S.S. ANDROS TOWER, her engines, tackle, apparel and furniture, Respondent,

Maroceano Compania Naviera S.A. of Panama, Claimant.

Nos. 426–59, 1032–60.

United States District Court
S. D. California,
Central Division.

April 13, 1961.

530

Lillick, Geary, McHose, Roethke & Myers, by Lawrence D. Bradley, Jr., Los Angeles, Cal., for Maroceano Compania Naviera S. A. of Panama.

Ekdale & Shallenberger, by Arch E. Ekdale, San Pedro, Cal., Roger Arnebergh, City Atty., Arthur W. Nordstrom, Asst. City Atty., by C. N. Perkins, Deputy City Atty., Los Angeles, Cal., for City of Los Angeles.

Allan F. Bullard, San Pedro, Cal., for United Towing Co.

J. A. Tucker, Jackson A. Jordan, Los Angeles, Cal., for Texaco, Inc.

YANKWICH, District Judge (after stating the facts as above).

■ I am of the view that the proximate cause of the damages caused by the S. S. Andros Tower was the sheers of the vessel while she was being shifted from berth 215 to berth 163, Los Angeles Harbor, and that the record does not disclose any fault by the pilot, Lee Weyant, Crowley Launch & Tugboat Company or Maroceano Compania Naviera S. A. of Panama, which caused or contributed to the accident.

■ In all drifting cases, the drifting ship

"must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a *vis major*, which human skill and precaution, and a proper display of nautical skill could not have prevented." The Louisiana, 1869, 3 Wall. 164, 173, 18 L.Ed. 85. (Emphasis theirs.)

See, Carr v. Hermosa Amusement Corporation, Limited, 9 Cir., 1943, 137 F.2d 983, 984. And see the writer's opinion in The Elwood, D.C.1947, 69 F.Supp. 368.

■ When a piloted vessel is grounded fault must be inferred

"unless good proof exculpates the navigator." Matheson v. Norfolk & North American Steam Shipping Co., 9 Cir., 1934, 73 F.2d 177, 179.

And see, Atlee v. Union Packet Co., 1874, 21 Wall. 389, 396–397, 22 L.Ed. 619. But the sheers of a vessel have been called

"unexplainable incidents which frequently occur in the navigation of vessels." Socony-Vacuum Oil Co., Inc. v. The George W. McWilliams, D.C.S.D.Tex.1951, 101 F.Supp. 912, 914.

■ I find nothing in the record from which to infer any fault on the part of the navigator. Perhaps the most thorough exculpation was given him by the Captain of the S. S. Andros Tower. We quote from the record:

"(By Mr. Ekdale)

"Q. If the tug had not been at the bow so that you could have dropped either the port or the starboard anchor, do you think that the ship would have continued to swing or would the anchors have stopped it? A. Nobody can explain.

"Q. Nobody knows? A. No.

"Q. Was there anything that you know that the pilot did that he could have done to have stopped the ship's swinging? Is there any other order that he could have— A. He tried to stop to—

"Q. *Was there anything he might have done that he didn't do?* A. *No.*

"Q. *You have no criticism of the pilot, then?* A. *No.*" (Emphasis added.)

This statement (and additional ones to be referred to hereinafter) also exculpates the ship for failure to drop the starboard anchor when ordered to do so when the ship began to swing to port fast, because there is nothing from which to draw an inference that had the order been obeyed the sheer could have been stopped and damage avoided. And before fastening liability we must find a proximate causal relation between the act and the damage. The strongest statement on the subject is that if this had been done it "might" have helped.

Again quoting from the testimony of the Captain of the S. S. Andros Tower:

"(By Mr. Bradley)

"Q. You are indicating the ship's bow swung to the port? A. Swung port, continues port.

"Q. Can you describe the rate of the swing to port? Can you describe how fast the bow swung to port, fast or slow or what? A. *In the beginning start slowly, but after it goes so fast and the pilot order one—'Hey, look at ship. Swing so fast. Stop it in order to drop the anchor, starboard anchor,' but impossible to drop*

*as it goes behind the anchor or as the forward tug with the men.*

"Q. The tug is underneath an anchor with its men? A. *Chief officer told me that and pilot say, 'Stop, no drop,' and pilot order number four tug to swing starboard to stop the ship to swing port. At that time broke the line, see, like this position here and continues swing.*

"Q. *Now you said that the tug's line broke and then the Andros Tower continued to swing to port?* A. Port.

"Q. Then what happened? A. It hit the pier.

"Mr. Ekdale: Hit the pier on the opposite side, he has indicated.

"The Witness: Hit the barge first.

"Q. Mr. Bradley: The Andros Tower first hit a barge? A. Barge.

"Q. That was the opposite side of the channel? A. Yes.

"Q. From pier 215? A. 215, and then she hit a dock and then second hit a dock again.

"Q. Then what happened? The pilot straightened around in the channel? A. Dropped the anchor again, I think. Drop the anchor again and after stop the ship's swing got back in the middle of the channel.

"Mr. Ekdale: He has indicated moving on the parallel with the dock in the channel. ·

"The Witness: The head outside.

"Q. By Mr. Bradley: Then after the pilot straightened the Andros Tower in the channel, she proceeded to berth 163? A. 163." (Emphasis added.)

So we have a situation where the Chief Officer, fearing that dropping the anchor might hurt the men on the tug, declined to obey the order. The Captain approved the action. And we cannot penalize the ship when a trained officer, in a perilous situation, uses his best judgment. The more so as it is not possible to say that the accident would have been avoided had the order been obeyed.

I cannot find any deviation from sound construction in the ship that, in any manner, made her more difficult to maneuver in the circumstances in which the accident occurred. And the ship, although a super-tanker, *had the right to use* the particular berth, which the City maintained, under compulsory pilotage.

The statement made by one witness that four tugs should have been used does not warrant a finding of inadequacy in the means used by the pilot. Similar navigational operations with three tugs had been executed, without mishap, by the pilot with similar types of ships and with this very ship. The tugs responded well to the orders given to them. The breaking of the line of one of the tugs cannot be related to the accident as a proximate cause. The fast sheering began before the break. The type of line was standard and had been used on similar operations. There is no showing that the particular line was defective or that its strength had been weakened by long use. In other respects the pilot attested the collaboration and obedience of the tug operators. Indeed, he said that when it became evident that there was "trouble" the tug captains seemed to anticipate the orders which he actually gave in changing their maneuvering position. So the only logical conclusion to reach is that we have here a case of

"inevitable accident, or a *vis major*, which human skill and precaution, and a proper display of nautical skill could not have prevented." The Louisiana, supra, 3 Wall. at page 173. (Emphasis theirs.)

Judge William Denman, years ago. warned us that

"Good seamanship does not require foreknowledge of unprecedented events." The President Madison, 9 Cir., 1937, 91 F.2d 835, 841.

Here the sheering of the vessel was unprecedented, unpredictable and inexplicable.

Hence the following ruling: Judgment will be that no recovery be had by any of the parties in this proceedings, ap-

pearing as libelants in rem or in personam, or cross-libelants in rem or in personam, or as interpleaded parties, or as intervening parties against any of the parties appearing in whatever capacity and through whatever pleadings or stipulations. The parties to pay their own costs.