MERRITT & CHAPMAN DERRICK & WRECKING CO. v. CORNELL
STEAMBOAT CO.

(Circuit Court of Appeals, Second Circuit. February 14, 1911.)

No. 159.

1. COLLISION (§ 67*)—VESSEL LYING IN CHANNEL—RISK OF COLLISION.
    While permission by the superintendent of anchorages in New York
    Harbor for a derrick to lie alongside a steamer stranded in a frequented
    channel for the purpose of discharging her cargo relieved the derrick of
    fault as obstructing navigation, it did not give her all the privileges of a
    vessel at anchor in anchorage grounds: but she took the risk of injury
    by collision with vessels navigating with care and skill.
    [Ed. Note.—For other cases. see Collision, Dec. Dig. § 67.*]

2. COLLISION (§ 71*)—UNAVOIDABLE ACCIDENT — VESSEL STRANDED IN CHAN-
    NEL.
    A collision in Hell Gate between the tow of a tug and a derrick lying
    alongside a steamer stranded on Flood Rock, near the middle of the chan-
    nel. held due to unavoidable accident, caused by the presence of a
    schooner, which caused the tug to change from her intended course, and
    not to any fault on her part; it appearing that she was properly navi-
    gated.
    [Ed. Note.—For other cases, see Collision, Dec. Dig. § 71.*]

Appeal from the District Court of the United States for the South-
ern District of New York.

Suit in admiralty by the Merritt & Chapman Derrick & Wrecking
Company against the Cornell Steamboat Company. Decree dismissing
libel (174 Fed. 716); and libelant appeals. Affirmed.

Burlingham, Montgomery & Beecher (E. P. Carver and H. L.
Cheyney, of counsel), for appellant.

Amos Van Etten (J. Parker Kirlin, of counsel), for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

WARD, Circuit Judge. This is an appeal from a decree of the
District Court dismissing a libel filed against the tug C. W. Morse.

May 23, 1908, the steamer H. M. Whitney grounded in the fog
on Negro Point, East River, and getting off subsequently stranded on
Flood Rock in Hell Gate, so that she lay north and south right across
the channel between Hallet's Point and Mill Rock, leaving a passage
of about 400 to 500 feet between her stern and Hallet's Point and
about 400 feet between her bow and Mill Rock. The derrick Will was
lying at her starboard quarter unloading the cargo with the permission
of the United States supervisor of anchorages. June 2, 1908, at
about 2:10 p. m. on a clear day, the tow of the tug C. W. Morse came
into collision with the derrick Will, which resulted in the total loss of
the derrick with her cargo.

May 29th the master of the Morse left Boston for New York with
a tow of three light boats, picked up two more at Newport, and on
June 2d, at about 1:30 p. m., at Whitestone bunched the tow with
three boats in the first and two in the second tier; the whole flotilla
being about 800 feet long. While at Boston he had seen a notice in

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

one of the papers that the Whitney had gone ashore at Negro Point; but he did not know that she had subsequently stranded on Flood Rock, although her position was published in many papers. If he had known the fact, it would have been his plain duty to await slack water before attempting to go through Hell Gate with such a long tow.

The Will or the Whitney might have notified tows approaching on the flood or ebb tide of her dangerous location, and the master of the Morse might by greater diligence or more intelligent curiosity have learned the position of the Whitney; but we do not think that the rights of the parties respectively depend upon either of these considerations.

The Morse was in charge of competent officers, her tow was not unusual in length or makeup, nor too heavy for the tug to handle. She was therefore lawfully navigating in the waters in question. The derrick Will also was lawfully alongside the wrecked steamer Whitney, having the permission of the supervisor of anchorages to lie there for the purpose of discharging the cargo of the Whitney. Though this relieved her of fault as obstructing navigation, it did not give her all the privileges of a vessel at anchor in anchorage grounds. In carrying on her business in this dangerous position, she took the risk of damage by collision with vessels navigating with care and skill. The Chauncey M. Depew (D. C.) 59 Fed. 791.

Since the removal or partial removal of Flood Rock, the ebb tide in the East River divides into two currents between Hallet's Point and Ward's Island; one running westwardly between Hallet's Point and Little Mill Rock towards Horn's Hook on the New York shore and the other northerly between Great Mill Rock and Ward's Island into the Harlem River.

The Morse discovered the location of the Whitney on Flood Rock when half a mile away, and ported a little to go down with the northerly current between Great Mill Rock and Ward's Island into the Harlem River, but subsequently, seeing a schooner coming up in that direction, starboarded and changed her course sharply to the westward to go between the stern of the Whitney and Hallet's Point. The expression "going up and down" these waters is constantly used as though they were a river, although they actually are a strait. The master of the Morse, doing the best he could, was unable to keep his tow from being carried by the tide against the derrick Will and doing the damage complained of.

When the master of the Morse discovered the schooner, he was put to a choice between three possible courses, viz., either to go between the stern of the Whitney and Hallet's Point or between the bow of the Whitney and Little Mill Rock or between Great Mill Rock and Ward's Island. As the schooner was nearer the Ward's Island shore, stemming the tide on a steady course with a fair wind, we should have supposed that it would have been more prudent to take the tow through the longer and wider space of water between Great Mill Rock and Ward's Island into the Harlem River on the northerly current. But the great weight of the expert testimony is to the contrary, and we do not presume to differ.

There is a dispute whether a presumption of fault arises against the Morse from the mere fact of collision. Assuming that the appellant is right in saying that such a presumption does arise, we think the Morse has rebutted it. The collision was caused by the emergency created by the schooner, and we cannot say that the master of the Morse showed any lack of care or skill in the choice he made to turn sharply on a starboard helm for the purpose of taking his tow between the stern of the Whitney and Hallet's Point, rather than to persist in his original intention of passing between Great Mill Rock and Ward's Island.

The decree is affirmed, with costs.