### THE ANNA C. MINCH (two cases).

(Circuit Court of Appeals, Second Circuit.  February 9, 1921.)

Nos. 129, 130.

1. **Collision ⬤═22—What constitutes "inevitable" accident depends on facts in each case.**

In determining whether a collision was due to "inevitable accident," the word "inevitable" must be considered as a relative term, and construed, not absolutely, but reasonably, with regard to the circumstances of the particular case.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Inevitable.]

2. **Collision ⬤═123—"Inevitable accident" affirmative defense.**

The law allows the party or vessel inflicting an injury by collision to be relieved of responsibility by proving that the accident was inevitable in the technical admiralty sense; that is, that it was of such a sort that it would not have been prevented by the use of that degree of reasonable care and attention which the situation demanded, but the burden is heavily upon the party asserting such a defense.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Inevitable Accident.]

3. **Collision ⬤═68—Breaking adrift in freshet due to inevitable accident.**

A steamer which broke from her mooring in Buffalo river during a spring freshet, carrying large quantities of ice, due in part at least to the breaking of an ice dam immediately below, subjecting her to such pressure as to cause all her lines, which were admittedly sufficient under any conditions to be ordinarily anticipated, to part at once, and which came into collision with a vessel moored below, *held* exonerated from liability on the ground of inevitable accident.

4. **Collision ⬤═69—Conforming to ordinary custom not a fault.**

A steamer which had wintered with a grain cargo in Buffalo Harbor *held* not chargeable with negligence in complying with the ordinary custom by leaving one of her anchors there buoyed when passing into the river to discharge in the spring.

Ward, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the Western District of New York.

Suits in admiralty by William M. Tashenberg and another and by the American Steamship Company against the steamer Anna C. Minch; the Kinsman Transit Company, claimant.  Decrees for respondent, and libelants appeal.  Affirmed.

For opinion below, see 260 Fed. 522.

These causes are brought to recover for injuries done by the Minch to the steamer Wickwire and the boat Tashenberg Bros. (severally owned by libel-

ants), when, on March 27, 1916, the Minch went adrift in the Buffalo river (or creek) and, drifting with the current, collided with the Wickwire and forced her into collision with the other vessel. The Buffalo river is an affluent of Lake Erie, not naturally navigable for modern vessels. By dredging, a channel averaging 200 feet wide has been established in a fairly straight line for about 1⅜ miles from the river's mouth. At this point there is a bend of about 90 degrees to the eastward, in which bend is situated the Ohio street lift or drawbridge. Above the bend the river (still navigable) is fairly straight for another five-eighths of a mile.

The river bottom contains soft clay and mud overlying rock to a depth ranging from one to several feet, and this rock bottom extends upstream as far as the Ohio street bridge. Above that bridge the channel is cut through solid rock. The summer river currents are slight, or wholly absent, though rapid fluctuations in Lake Erie may produce quite strong currents within no more than a mile of the river mouth. But heavy rainfalls and spring freshets are attended by strong outflowing currents, and these conditions sometimes damage vessels by tearing them from their moorings, though such conditions are not frequent. Heavy ice forms in the river, usually in December, and that ice commonly goes out in the spring during a freshet in the river, and the combined effect of the then prevailing strong outflowing currents and the heavy moving ice is at times very great, and during such times the liability of damage to vessels is considerable. The foregoing description of the scene of disaster is taken from an official survey of the Great Lakes, published by the War Department in 1915, and in evidence herein.

The Minch, partially loaded, lay just above the Ohio street bridge, and therefore just above the bend alluded to. Her bow was upstream and she was moored with her starboard side to the bulkhead and opposite the elevator, into which she was discharging the "storage cargo" of grain with which she had spent the winter in Buffalo Harbor.

For some days before March 27th the water of the river had been rising in freshet, the ice was very heavy, and the conditions of exactly the kind described in the above lake survey. In anticipation of difficulty, additional lines were put out and fastened in a manner discussed in the opinion below. The Minch had no steam up, and, although she carried two anchors, had left one of them buoyed in Buffalo Harbor, a proceeding proved to be customary with vessels coming into the river after spending the winter in the harbor. The other anchor weighed two tons, was ready to be dropped upon the opening of the usual compressor, and was governed by a windlass of well-known and approved construction. One way in such an apparatus of controlling the jerk of the cable chain is to drop a riding pawl upon the chain, and this pawl is designed to be kept out of contact (until wanted) by a rope or lanyard which holds it up until released.

At least one of the fasts of the Minch ran through the windlass room, and in proximity to the windlass, pawl, and lanyard. In the afternoon of March 27th, descending ice, encountering the Ohio street bridge at the bend aforesaid, had formed a kind of dam, which it was thought proper by the fireboats of the city of Buffalo to break. The master of the boat that did this testified that "the ice was hanging right onto the bottom, and there was clampers probably 10 or 12 or 15 or 20 feet square, standing up 5 or 6 or 7 feet above the level of the water; that is, underneath the bridge where she jammed up, and, according as I would break it, it would let go."

The fireboat projected itself against this mass of ice, and, as the captain said, "the first time I hit it, it didn't come, but I could see it was coming; * * * but when I hit it the second time, over near the starboard side of the draw, that is where it came; * * * she came with a mad rush, and I couldn't turn around. I went round on the port wheel, and seen I couldn't make it, and I straightened up, and just then I saw the Minch coming through the bridge." The testimony is clear that the Minch's lines went all at once, and she began to go down the stream with the torrent of ice and water released by what the fireboat had done, at a rate estimated by her master of from 8 to 10 miles an hour. There were some 16 other vessels moored on one side or the other of this narrow channel below the Minch; yet that vessel passed through the draw of the nearby Ohio street bridge, passed a dozen

271 F.—13

other steamers, through the draw of the Michigan street bridge, more than half a mile below, and then struck the Wickwire, moored about 500 feet below the Michigan street bridge, doing the damage complained of.

As soon as the Minch went adrift, her mate, on the captain's order, opened the compressor in the attempt to stop the vessel by means of her anchor; but the lanyard which held the pawl out of contact with the chain cable had parted, releasing the pawl into the stop position. As soon, therefore, as the chain began to run, it meshed with the pawl, and the anchor went no further. Much testimony was offered to the effect that the bottom was rock, with such a slight covering of mud that no anchor would hold, if indeed, owing to the ice which had formed in the Creek and over which the freshet was running, any anchor could have gotten to the bottom.

After a protracted trial, in which numerous witnesses were orally examined, the trial judge sustained the defense of vis major and dismissed the libel. These appeals followed.

Harvey L. Brown, Fred W. Ely, and John B. Richards, all of Buffalo, N. Y., for appellants.

Holding, Masten, Duncan & Leckie, of Cleveland, Ohio, for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). It is perhaps unfortunate that so many terms have been used by the courts for describing the kind of excuse presented at bar for inflicting upon an innocent sufferer what the law ordinarily calls a tort. "Accident" is a very plastic word. Ætna, etc., Co. v. Vandecar, 86 Fed. 285, 30 C. C. A. 48. Vis major, or the act of God (Southern Pacific Co. v. Schuyler, 135 Fed. 1015, 68 C. C. A. 409) has been thought to be identical in meaning with inevitable accident (Bouv. Law Dict., sub nom "Vis major"). The phrase "pure accident" (The Transfer No. 19, 194 Fed. at 78, 114 C. C. A. 155) is not practically distinguishable from "unavoidable accident" (Merrit, etc., Co. v. Cornell, etc., Co., 185 Fed. 262, 107 C. C. A. 367). The most widely accepted phrase, "inevitable accident," is preferable in maritime law, not only because it is the most commonly used, but because it has acquired, under repeated decisions of authority, a plain and easily stated technical meaning.

[1] It was very early pointed out that the word "inevitable" must be considered as a relative term, and construed, not absolutely, but reasonably with regard to the circumstances of each particular case. Amoskeag, etc., Co. v. The John Adams, 1 Cliff. 404, Fed. Cas. No. 338, citing The Europa, 2 Eng. L. & E. 559. Remembering this limitation, which really signifies no more than that inevitableness is always a question of fact governed by evidence, our courts have, we think, uniformly adopted the rule of The Merchant Prince, L. R. Prob. Div. (1892) 179, and it has been restated at length by Justice Lurton (when Circuit Judge) in The Olympia, 61 Fed. 120, 9 C. C. A. 393, and specifically adopted by this court in a line of cases from The Edmund Moran, 180 Fed. 700, 104 C. C. A. 552, to The Westchester, 254 Fed. 576.

[2] In any discussion of the defense of inevitable accident it is to be borne in mind that that which is to be found inevitable is the injury done to the complaining party. What the law would normally call a tort becomes an accident, if its infliction was inevitable in the sense

Lacombe, J., ascribed to the word in The Lackawanna, 210 Fed. 264, 127 C. C. A. 80. The law allows the injuring party to relieve himself of responsibility by proving if he can—

"that the accident was inevitable in the technical admiralty sense; that is, that it was of such a sort that it would not have been prevented by the use of that degree of reasonable care and attention which the situation demanded. The burden, of course, is heavily upon [the party] asserting such a defense. Sometimes it is established by showing what was the real cause of the accident, * * * and further showing that such cause became efficient without any negligence on the part of" the injuring person or thing.

In the present case the second branch of the rule of The Merchant Prince—i. e., the exhaustion of all possible causes—is not applicable, because there is no doubt as to how the Minch came to go adrift and to continue her drifting. We are concerned only with the question of fact whether the operation of those causes could have been prevented by "reasonable care and attention," which is but another way of inquiring whether the injury complained of was proximately caused by the force or power over which the party defendant had by the exercise of ordinary care and skill no effective control. And proximate cause also is a question of fact. Muller v. Insurance Co., 246 Fed. 759, 159 C. C. A. 61, citing cases. Nor is the nature of the problem changed by the statement that the conclusion of inevitable accident is "not to be lightly arrived at" (The Bayonne, 213 Fed. 217, 129 C. C. A. 561), which is but a variant of the above-quoted remark from The Lackawanna, that the burden of this defense is heavily upon him who asserts it.

[3] It is not denied that when the Minch went to her mooring place she was properly fastened, even for ordinary spring weather in Buffalo river. Several hours before this disaster conditions evidently demanded additional fastenings, and the master accordingly put out lines, until he had running from a heavy bridle at his bow an eight-inch harbor towline securely fastened to two spiles on the wharf. Three parts of a six-inch mooring line joined his forward port and starboard bitts to another spile on the wharf, while the connection between the wharf and the forward starboard bitts was further strengthened by two parts of a ten-inch hawser. No attack is made upon the quality of any of these lines, yet, as above stated, they all went at once.

It is used as an argument against the Minch that the other vessels in the river for the most part held to their moorings; but we find as a fact that the Minch was so placed as to be peculiarly exposed to the flood of ice and water caused by the breaking of what was practically a dam at the Ohio street bridge. The other craft encountered the torrent only when its initial force had been somewhat exhausted. Undoubtedly it was the duty of the Minch's master to take precautions against trouble; we think he did so, so far as the number and placing of his lines was concerned; indeed, the matter is summed up by a statement of one of libelant's witnesses that the Minch "had lots of lines out"; and when asked, "You don't condemn the number of lines he had out as too little?" the answer was, "No."

It is next asserted that the lines were not equalized, because, when the additional fasts were put out, the vessel was not slacked back on the current until all lines were taut. At the time, however, when these lines were put out, the current was not heavy; additional fastenings were provided against what might occur, and the new ropes were tautened by the use of a tackle with two double blocks and the capstan. When libelant's witnesses (or some of them) say that you cannot do "much more with a tackle than with hand power," the statement is disproved by the engineering evidence in the record and by common knowledge. Luce's Seamanship, p. 70 et seq.

But what we deem the conclusive proof that the Minch's lines were all taut and all holding at the same time is the fact that they all went together. If they had been unequally tautened, there would naturally have been a perceptible interval between the snapping of the taut lines and that of those that were slack when the taut ones parted.

[4] Criticism of the Minch's management is also made, in that she had left one anchor out in the harbor. It is proved that such is the ordinary custom of lake craft in Buffalo Harbor and river, and entirely apart from the fact that in harbor waters one two-ton anchor was obviously sufficient for the reasonably to be expected needs of a vessel of the Minch's size, we hold as matter of law that it was no fault of the master to comply with the ordinary custom of his trade; to do so was exercising that ordinary care and skill which is all that is expected of him.

Finally, it is said that it was negligence to open the compressor and start the anchor without examining into the condition of the riding pawl. Negligence is never anything more than lack of care according to the circumstances; the circumstances surrounding this episode were that haste was required. It is close to a miracle that the Minch drifted safely, injuring neither herself nor any one else, through two drawbridges and past a double line of shipping. The anchor was a last resort to save the vessel from contacts reasonably to be expected before she would drift more than her own length. Speed was of the essence; the riding pawl had been triced up shortly before. We find it fairly established as matter of fact that the flying cable ends in the windlass room had severed the lanyard; so that the question becomes one of fact: Was it the absence of the ordinary skill of his calling on the part either of the mate or the master to fail to examine the conditions of the riding pawl before opening the compressor?

The matter is not one of law, but of fact, and we answer the question in the negative. It may be argued thus—that if the mate had examined and tested his machinery including the riding pawl before he started the compressor, and a collision had happened (as it well might) within the time that would have been required for such examination—he would most certainly have been accused of negligence for doing that which it is here said he ought to have done. No trier of the facts can hold an ordinarily skillful man to such exiguous care.

In conclusion, it may be observed that we are here favored with Judge Hazel's very careful and persuasive exposition of evidence

(largely expert), given in open court. The differences of opinion manifested in the record are acute; in our judgment, most of the criticisms of the Minch's management are excellent illustrations of how much more accurate is hindsight than foresight. But all that the crew of the Minch were bound to was a reasonable exercise of that foresight which grows out of ordinary skill in their several occupations. This we think they manifested, and conclude that the accident to libelant's boats was in the technical admiralty sense inevitable.

Decrees affirmed, with costs.

WARD, Circuit Judge (dissenting). The claimant's defense is that the steamer was broken away from her moorings and collided with the vessels owned by the libelants as the result of vis major, without any contributing negligence on its part; i. e., that the accident was inevitable. The law applicable to the situation is perfectly simple, viz. the claimant, having proved the cause of the accident, was further bound to prove that it could not have been prevented by the exercise of due care on its part, which is care according to the circumstances. The Merchant Prince, L. R. Prob. Div. (1892) 179, followed in this circuit in The Edmund Moran, 180 Fed. 700, 104 C. C. A. 552, and many other cases.

Now here there was no sudden emergency. The danger that the force of the increasing current and pressure of ice might tear the steamer adrift from her moorings was perfectly apparent, and had been so since early morning, and until 5 p. m., when the steamer went adrift. The city fire tugs were working to break up the ice jams all day, and if there was an ice jam down to the bottom of the stream at the Ohio street bridge some distance astern of the steamer the effect of the tugs breaking it loose was also apparent. Under such circumstances due care was a very high degree of care indeed.

It was in view of this obvious situation that the master by 11 a. m. had put out heavy additional mooring lines. The large, half-loaded steamer at that time must have been straining heavily on her original fasts. These additional lines, with one exception, were put out and tautened by hand power. Three men only were employed to handle the heavy cables, although there were 12 aboard. A 10-inch manila hawser were tautened by a tackle on the windlass. It seems perfectly clear that the strain on the other additional 6 and 8-inch lines could not have been equalized with that on the original lines by hand power. The only way it could have been accomplished would have been by slacking the original lines, letting the steamer go astern on the current, and then making fast all the lines. This was not done.

That 7 or 8 lines, even if the strain were equalized, could all part at the same time, I do not believe; but, as the court relies upon the testimony of the master on this point, I will state it as follows:

"A. As the ice moved, our moorings parted practically at the same time, and we started with the ice. * * *

"Q. Now, when it comes down to the time of the actual breaking away, which line parted first? A. They parted so near all together that it would be impossible to say which went first. * * *

"Q. Then the forward lines parted first—leave it that way. How long afterwards did the after lines part? A. About a second or some such a matter. * * *·

"Q. Of the manila lines and cable forward you cannot tell us which ones parted first? A. No, sir.

"Q. And within what space of time did they all part? A. Practically like snapping your finger.

"Q. You can't tell us whether the harbor towline went before the big 10-inch hawser? A. No. * * *

"Q. Give us the maximum time from the time the first line parted until all your lines forward· were gone; was it half a second? A. Half a second was a very small period of time.

"Q. You said you thought the after lines went within a second of the forward lines? A. Yes.

"Q. How much time was there from the time the first forward line parted and the last? A. The space of time was very short; that is about as close as I could give it to you; I couldn't say positively as to the time. * * *

·"Q. There was no way you could tell, from the sound of the parting and from the appearance and the movement of the lines, as to whether the cables held as long as the manila lines, or not? A. I was more concerned with trying to get her stopped than the time it took to part them."

Estimates of time are uncertain at the best. The master's estimate was not likely to be very accurate in such an emergency as this, nor did he pretend to exactness. It seems to me unreasonable to conclude from it that the strain on the lines must have been equalized. I am quite satisfied that it could not have been.

The next evidence as to want of care is in connection with the anchor. Being entirely without steam, the only thing left to stop the steamer, if sent adrift, was a 4,000-pound anchor hanging at the hawse pipe. Common prudence required the master to see that it was in complete readiness to go. I think he ought to have kept one of his 12 men standing by to open the compressor instantly. When the lines parted, he immediately sent the mate from the forward deck to the windlass room to do so. There is evidence from which it might be inferred, as the opinion of the court does infer, that the lanyard which held up the riding pawl had been parted by the flying end of some part of the lines, and the pawl dropped upon the anchor chain lying in the wildcat. However, the mate, without stopping to see whether the chain was clear, opened the compressor and the chain was immediately stopped by the pawl. The weight of the anchor made it impossible to free the chain in time to let the anchor go before the collision.

It is true that the bottom where the steamer lay was rocky, and the anchor might not have taken hold; but she went for a long distance before the collision over a mud bottom, which was good holding ground, and who can say the anchor would not have stopped her way? In this particular, too, there was lack of care according to the circumstances.

It is significant that, out of 19 vessels moored on either side of the Buffalo river, only the Minch was broken from her moorings by the force of the current and the ice.

I think the decree should be reversed.