## THE CHARLES H. SELLS.

### No. 302.

Circuit Court of Appeals, Second Circuit.

April 12, 1937.

632

Emery & Pyne and Warner Pyne, all of New York City, for appellant.

Lynch, Hagen & Atkins, of New York City (Anthony V. Lynch, Jr., and Henry C. Eidenbach, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a decree dismissing a libel in rem against the scow, "Sells," for damage which she caused when she broke adrift in the Hudson River on the morning of January 21, 1934. The "Sells" had been moored at the outside of a pier of the Plaza Sand & Stone Company at Yonkers, where she had been waiting for more than a month. The pier is about forty feet wide at the end, and the "Sells" was one hundred and twelve feet long; therefore she stuck out on each side for about thirty-six feet. The pier is a hundred and twenty-five feet long, but only a few feet wide at the bulkhead; on its southern side, near its end, it angles out like a sad-iron to gain the forty feet just mentioned. The bulkhead to the north was not available as a berth, because it was used for discharging scows by the Yonkers Builders Supply Company; the bulkhead immediately to the south was owned by the Plaza Sand & Stone Company, but was also used for unloading. South of this bulkhead was the property of the libellant, from which jetted out another pier at which it moored its vessels. On the morning in question there were four all told of these on the north side of this pier: a steamer at the bulkhead, another vessel alongside the pier, and two scows outside of her. The weather had been cold during January, and the river was full of ice, not solid but in large floes. The twenty-first was a Sunday and during the preceding week ice breakers had been at work clearing the slip of the "Alpine Ferry," a short distance north; but whether these had done so on Saturday and Sunday did not appear. In the morning of Sunday some large floes broke the "Sells" loose, and the tide carried her down upon the libellant's scows. This was the damage in suit. It was not disputed that the "Sells" was properly moored for ordinary strains; she had new fasts in plenty; the wind was light; there was no extraordinary tide; the temperatures had been moderate for a day or two. The only question is whether, considering the season and the ice, she took the chance that her fasts might carry away, in case unexpectedly large floes came down, or got behind one end and pried her loose. The judge thought that it was a case of "inevitable accident" under The Anna C. Minch, 271 F. 192 (C.C. A.2), and exonerated the scow; the libellant appealed.

In archaic law he who caused damage must make restitution, regardless of the likelihood that his conduct would so result; and that doctrine has its survivals now that "fault" has become the controlling factor in the law of torts. Thus, liability has remained absolute for trespass, and there is an ill-defined liability, where one harbors or possesses things likely to damage others. Fletcher v. Ryland, L.R. 3 H.L. 330; Exner v. Sherman Power Const. Co. (C.C. A.2) 54 F.(2d) 510, 80 A.L.R. 686. The whole of workmen's compensation is based upon the notion that he who undertakes a venture may properly be charged with its attendant damage to others; and for that matter so is the liability of a master for the acts of his servant. The law might have treated a moored ship in the same way; that is, as absolutely liable for any damage if she breaks loose; there was no decisive reason why the loss should lie

where it fell. But it has not been so held, and although she has the burden of proving her innocence, she need only show that she made "a proper display of nautical skill." The Louisiana, 3 Wall. 164, 173, 18 L.Ed. 85. In such cases, as well as in those where a vessel suddenly becomes unmanageable, it has become customary to speak as though if there be an "inevitable accident," it is an excuse for what would otherwise be a wrong. That is erroneous; the phrase does not cover ascertainable exculpating occasions; it means no more than that the vessel must show herself free from "fault" in the ordinary sense. Amoskeag Mfg. Co. v. John Adams, Fed.Cas. No. 338, 1 Cliff. 404; The Olympia, 61 F. 120 (C.C.A.6); The Edmund Moran, 180 F. 700 (C.C.A.2); The Lackawanna, 210 F. 262, 264 (C.C.A.2); The J. Rich Steers, 228 F. 319 (C.C.A.2); In re Reichert Towing Line, 251 F. 214 (C.C.A.2); The Westchester, 254 F. 576 (C.C.A.2); The Columbia, 255 F. 515 (C.C.A.2); The Herm, 267 F. 373 (C.C.A.4); The Anna C. Minch, supra, 271 F. 192; The City of Camden, 292 F. 93 (C.C.A.3); Cranberry Creek Coal Co. v. Red Star T. & T. Co., 33 F.(2d) 272 (C.C.A.2); The Merchant Prince, L.R.(1892) Prob. 179 (C.A.).

This does not, however, help much, because we have no guide as to what is "a proper display of nautical skill" in a given case. As in all such situations the legal standard is the function of three variables: the actuarial possibility that the event will occur; the gravity of the damage, if it does; the expense and effort necessary to fend against it. The B. B. No. 21, 54 F. (2d) 532, 533 (C.C.A.2). In the case at bar the damage inflicted if the "Sells" broke loose would be far greater than the cost of finding another berth, if there were one. The claimant did not show that there were none, and apparently that of the Hudson River Day Line was for hire and close at hand; the cost of towage and wharfage would have been insignificant. Therefore, it required but a slight probability that she would break loose, to charge her; and that probability was not to be measured alone by the fact that she had already lain there safely for a month. Her position was inherently dangerous; only about one-third of her length was alongside the pier, and that resulted in giving ice at either side of either end, and especially on the inside, an exceptional leverage, and in putting strains upon the fasts which they were not designed to withstand. There was no evidence that anything unusual had occurred the day before or on Sunday morning, against which the claimant was unprepared; the icebreakers may have been at work, but they are not shown to have been. The claimant did not therefore carry what Lacombe, J., called the "heavy burden" in such cases. The Lackawanna, supra, 210 F. 262, 264. Theoretically it is possible to think of the doctrine as though it could be quantitatively applied; practically that is an illusion; the first two factors are never ascertainable with the accuracy necessary for an equation. Perhaps no precedent should therefore be authoritative, especially as the elements never reproduce themselves exactly. But the habit is a strong one, and if the situations are approximately the same, the same result ought to follow.

For this reason the judge quite naturally and properly thought pertinent The Anna C. Minch, supra, 271 F. 192. The facts there were that the Buffalo River, in which the "Minch" lay, had been so jammed with ice that an ice dam had formed down to the bottom, which fire boats had come that morning to break out. When they did so, the ice and water were drawn down in such a sudden flood that they sucked the "Minch" away from her moorings just above the dam, and carried her downstream. Unless those in charge of her had some warning that the jam was to be broken, that was not a danger with which they should have been charged; and Judge Ward, who dissented, relied upon the fact that they had been advised, and failed to put out added fasts. But nobody suggested that the "Minch" was at fault for not taking a berth further up stream, and probably she was not. Apparently it is true that she could have gone some distance further, but whether when the jam went out, this would have availed, was at least uncertain. The decision is not to be taken as a precedent upon the point; it went merely upon the sufficiency of the fasts. In the case at bar we do not charge the "Sells" with failure to put out more fasts, but because she did not prove that there were no other available berths, and that the ice was not heavy enough to endanger her as she lay. If she was to be used for weeks as a depository for crushed stone, it should not have been at any appreciable peril to adjacent craft.

Decree reversed; decree for the libellant.