Petition of PENNSYLVANIA R. CO.

Petitions of DENNEY et al.

THE P. R. R. NO. 225.

THE NO. 172.

THE NO. 196.

District Court, S. D. New York.
Feb. 19, 1942.

618

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark, A. Howard Neely, and Frederic Conger, all of New York City, of Counsel), for petitioner Pennsylvania R. Co.

Hagen & Eidenbach, of New York City (Charles W. Hagen, Henry C. Eidenbach, and Nelson J. Johnson, all of New York City, of counsel), for petitioners C. E. Denney and John A. Hadden, trustees of property of Erie R. Co.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney and James J. Donahue, both of New York City, of counsel), for claimant, Glenn L. Martin Co.

COXE, District Judge.

These proceedings grow out of the hurricane which swept over New York Harbor on the afternoon of September 21, 1938. At the height of the storm, two Erie Railroad lighters, Nos. 172 and 196, broke adrift in the slip between piers 2 and 3, Bush Docks, Brooklyn, and shortly thereafter collided with and pounded against the Pennsylvania Railroad lighter No. 225, which was at the time loaded with an airplane and airplane parts. As a result of the accident, the No. 225 sank, and her cargo was seriously damaged. There was also some relatively slight damage to the Lehigh Valley Railroad barge, No. 33, which was moored near the No. 225.

Three separate limitation proceedings have been commenced, one by the Pennsylvania Railroad Company, owner of the lighter No. 225, and the other two by the trustees of the Erie Railroad Company, owner of the lighters Nos. 172 and 196. In the Pennsylvania proceeding, claims have been filed by Glenn L. Martin Company for the damage to the airplane and airplane parts loaded on the No. 225, and by the Lehigh Valley Railroad Company for the damage to the No. 33. In the two Erie proceedings, the Martin and Lehigh Valley companies have filed claims similar to those asserted in the Pennsylvania proceeding. Claims have also been filed in both Erie proceedings by the Pennsylvania Railroad Company for the damage to the No. 225 and for indemnity against claims filed in the Pennsylvania proceeding, and by the captain of the No. 225 for loss of personal effects. The three proceedings have not been consolidated, but have been tried together, and will be disposed of in one opinion.

The main controversy is between the Martin Company and the Pennsylvania and Erie companies with respect to the liability of either or both of those companies for the damage to the airplane and airplane parts loaded on the No. 225. It is not disputed that this damage was extremely heavy. The Martin Company seeks to hold the Pennsylvania Company as a carrier under the terms of its bill of lading; it predicates its claim against the Erie Company on the ground of negligence. The railroad companies resist liability principally on the ground either that the accident was inevitable, or was caused by the act of God.

There was considerable confusion at the trial due to the fact that some witnesses used Daylight Saving Time and others Eastern Standard Time. In order to avoid further confusion in this respect, I shall hereinafter use only Daylight Saving Time, except in connection with the weather records, and, as to these latter, I shall use Eastern Standard Time followed in parenthesis by the equivalent Daylight Saving Time.

Piers 2 and 3, Bush Docks, are covered piers, 1337 feet long, with solid fill under the decking of each pier extending from the bulkhead to a point about 150 feet from the pier end. The slip is 270 feet wide, and faces northwest; it therefore affords protection to vessels in the slip from any wind except northwest. On September 21, the wind was north until 2:04 P.M. (3:04 D. S. T.) when it shifted to northwest and blew directly into the slip, accompanied by high waves. Shortly after this change in the wind, the two Erie lighters, Nos. 172 and 196, broke from their moorings and drifted up the slip.

There is a conflict in the testimony regarding the location of the Erie lighters prior to their breaking adrift. The witnesses for the Martin Company testified that they were moored outside of another Erie barge in the last or end berth on the south side of Pier 3. The Erie witnesses, on the other hand, placed the lighters outside of the Erie gasoline hoister No. 104, on the south side of Pier 3, about 400 feet in from the pier end; the No. 104 lying broadside to the pier, the No. 196 next to the No. 104, and the No. 172 outside of the No. 196. It is difficult to reconcile all of this conflicting testimony, but I am satisfied

that the location 400 feet from the end of Pier 3, as testified to by the Erie witnesses, is fairly supported by the evidence. That is where Horan and Callahan, the captains of the Nos. 172 and 196, said the two lighters were when they broke adrift. The location is further supported by the testimony of Seaburg, captain of the Pennsylvania barge No. 485, who said that his boat was in the end berth on the south side of Pier 3, with its outer end about 200 feet from the pier end; it is also supported by the testimony of Heaney, captain of the Erie gas hoister No. 110, who said that the No. 110 was moored on the south side of Pier 3 between the No. 485 and the three Erie boats Nos. 104, 196 and 172. I find, therefore, that at the time the Nos. 172 and 196 broke adrift they were moored outside the No. 104 on the south side of Pier 3, about 400 feet from the pier end.

The Pennsylvania No. 225 is a wooden derrick lighter, 89:4 feet long, and has rake ends. The lighter arrived at Bush Docks on September 19, 1938, at 12:30 P. M., with a cargo consisting of an airplane, airplane parts and automobile parts. The airplane and airplane parts were covered by a bill of lading naming Funch, Edye & Company, Inc., Java-New York Line, as the consignee, and giving the "Mail or street address of consignee— For purpose of notification only" as "25 Broadway, New York, N. Y.". The bill of lading contained a provision to the effect that the responsibility of the railroad company would be reduced to that of a warehouseman after the expiration of the free time allowed by the tariffs, and "after notice of the arrival of the property * * * has been duly sent or given". There was also a provision exempting the railroad company from liability for loss or damage caused by the act of God.

Upon arrival at Bush Docks, the No. 225 was berthed at the bulkhead outside of the four Pennsylvania railroad steel lighters, Nos. 266, 269, 209 and 264; all five lighters were then lying broadside to the bulkhead, with the No. 225 made fast to the No. 264, the fourth boat in the group. Gellert, captain of the No. 225, delivered his documents to a "receiving clerk" on the pier at 1 P. M. on September 19. No notice other than this was given of the arrival of the cargo. On the following day, September 20, the No. 225 was shifted to the south side of Pier 3, where the automobile parts were unloaded; the lighter was brought back in the early afternoon of the same day to her original berth at the bulkhead, outside of the four steel lighters, where she remained until the accident.

There were in all twenty-two vessels moored in the slip when the Nos. 172 and 196 broke adrift. Of these, five were moored at the bulkhead, ten on the south side of Pier 3, and seven on the north side of Pier 2. During the hurricane, four of the ten vessels on the south side of Pier 3, including the Nos. 172 and 196, broke adrift; one other, the No. 485, parted her lines and sagged down on the No. 110, which was moored farther in towards the bulkhead. On the north side of Pier 2, the S. S. Hertford, a large ship lying bow in near the pier end, broke away from the pier at her stern, and only avoided trouble by letting go her anchors in the center of the slip; just ahead of the S. S. Hertford, and near the middle of the pier, the No. 442 parted her lines but was able to keep from breaking adrift by putting out other lines.

The hurricane of September 21, 1938, was an extremely heavy storm. Practically all of the witnesses agreed that it was the worst storm they had ever seen in New York Harbor. Parry, of the New York Weather Bureau, testified that what made the storm so bad was the combination of the "wind and high seas"; he also said that it was the only storm in which there had been a "storm wave". The records of the Weather Bureau show that from 2 to 3 P. M. (3 to 4 D. S. T.) the wind averaged 60 miles an hour, with a maximum velocity of 69 miles at 2:50 P. M. (3:50 D. S. T.); from 3 to 4 P. M. (4 to 5 D. S. T.) the average velocity was 62 miles, with a maximum velocity of 70 miles at 3:37 P. M. (4:37 D. S. T.). During this two hour period the wind was continuously northwest.

The Nos. 172 and 196 broke adrift at about 3:25 P. M. Callahan, captain of the No. 196, testified that shortly after 3:15 P. M. large storm waves broke over the boats, snapping the lines between the No. 196 and the No. 104, and casting the Nos. 172 and 196 adrift. Horan, captain of the No. 172, gave similar testimony. The lines between the Nos. 172 and 196 held, and the two boats drifted up the slip together, the No. 196 finally bringing up against the No. 225 in her bulkhead position. In the high seas then running in the slip, the No. 196 pounded heavily against the No. 225,

which, in turn, pounded against the No. 264, the steel lighter next to the No. 225. As a result of this pounding, the No. 225 capsized at 5:20 P. M. and dumped her cargo.

The two railroad companies had no warning of the approach of the hurricane. The weather reports for September 18, 19 and 20 all referred to a tropical hurricane in southern waters; even as late as 4:25 A. M. (5:25 D. S. T.) on September 21, the report received at the New York Weather Bureau was that the center of the storm would "pass near but slightly off Cape Hatteras", and that storm warnings were being displayed "north of Wilmington, N. C. to Atlantic City".

At 10:40 A. M. (11:40 D. S. T.) on September 21, the New York Weather Bureau received the following weather report from Washington: "Hoist northeast storm warnings nine A. M. north of Atlantic City and south of Block Island, R. I. and hoist southeast storm warnings Block Island to Eastport, Maine. Tropical storm apparently central about 75 miles east of Cape Hatteras moving rapidly north-northeastward attended by shifting gales over a wide area and by winds of hurricane force near center. Northeast or north gales backing to northwest south of Block Island to Hatteras today and southeast or east gales Block Island to Eastport becoming northwest tonight or Thursday morning. Small craft should remain in port until storm passes".

It was the practice of the New York Weather Bureau, on receipt of such a report as this, to raise warning flags at the top of the Whitehall Building, and then to advise various "local interests" by telephone the substance of the forecast. The Pennsylvania and Erie railroads were among the "local interests" to whom these telephone messages were sent. Parry, of the New York Weather Bureau, explained that the report was never telephoned verbatim to the "local interests" but only an "abridgement", and that it might take anywhere from forty minutes to an hour to complete all of the telephone calls.

The telephone message with respect to the 10:40 A. M. (11:40 D. S. T.) report was received by the Pennsylvania Company at 11 A. M. (12 M.-D. S. T.) and taken down stenographically by Serbe, a stenographer in the office of the Boatmaster at Jersey City, and immediately afterwards typed. Serbe testified as a witness and identified a typewritten copy of the message received by him, reading as follows:

"Pier H, Sep. 21, 1938.
"Telephone Message:
"Received 11: A. M. (EST) from U. S. Weather Bureau:
"Hoist N-E storm warning 9:00 A. M. north of Atlantic City to south of Block Island.
"Tropical storm, about 75 miles east of Cape Hatteras, moving rapidly north-northeastward and attended by shifting gales over wide area and by wind of hurricane force near center.
"Small craft should remain in port until after storm passes.
"C. J. S."

The Erie Company likewise received "around 11 A. M." (12 M.-D. S. T.) a telephone message from the New York Weather Bureau with respect to the 10:40 A. M. report, but no record was made of the text. I have no doubt though that the message was substantially the same as the one received by the Pennsylvania Company.

At 12:02 P. M. (1:02 D. S. T.) a further weather report was received by the New York Weather Bureau from Washington, reading as follows: "Change to whole gale warnings 11:30 A. M. Atlantic Coast north of Virginia Capes to Sandy Hook, N. J. Tropical storm central 10: A. M. about 100 miles east of the Virginia Capes moving rapidly northward or slightly east of north. It is attended by shifting gales over a wide area and by winds of whole gale force over a considerable area around center. Northerly winds along the New Jersey, Maryland and southern Delaware coasts will likely increase to whole gale force this afternoon and back to northwest and diminish tonight".

An abridgement of this report was also transmitted by telephone to the "local interests", and was received by the Pennsylvania and Erie companies at about 1 P. M. (2 D. S. T.). The text of the message as received by the Pennsylvania Company was again taken down stenographically by Serbe, the same stenographer who had reported the earlier message, and read as follows:

"Telephone message received 1 P. M. E. S. T. from U. S. Weather Bureau:
"Change gale warning along Atlantic Coast North of Virginia Cape to Sandy Hook, N. J. Tropical storm centered at 10:00 A. M. 100 miles east of the Virginia

Cape, moving rapidly north or slightly east of north.

"C. J. S."

Upon receipt of the 10:40 A. M. (11:40 D. S. T.) report, the New York Weather Bureau raised flags at the top of the Whitehall Building carrying northeast storm warnings. These flags remained up until after the receipt of the 12:02 P. M. (1:02 D. S. T.) report, when the warnings were changed to whole gale warnings, but there was no indication even then of any expected change in the direction of the wind. Indeed, it was not until after the wind actually changed to northwest at 2:04 P. M. (3:04 D. S. T.) that the flags carried northwest storm warnings.

There is nothing in this history to indicate that the railroad companies should have anticipated that the hurricane would strike New York Harbor. Even the Weather Bureau did not expect that to happen. Parry, of the New York Weather Bureau, testified: "We did not expect it. As I testified in the previous case, we expected it to move up the coast, and we did expect that it would recurve, as the storms usually do, to the northeast. We did not expect it to move in from Long Island".

Neither was there anything in the weather conditions during the morning of September 21 to cause anxiety for the safety of vessels moored in the slip between Piers 2 and 3, Bush Docks. The weather report for September 21 shows that rain fell throughout the morning, and that the wind was north continuously from 2 A. M. (3 D. S. T.) until the change to northwest came at 2:04 P. M. (3:04 D. S. T.) The average velocity of the wind between 9 and 10 A. M. (10 & 11 D. S. T.) was 22 miles; between 12 M. and 1 P. M. (1 and 2 D. S. T.) 38 miles; and between 1 and 2 P. M. (2 and 3 D. S. T.) 46 miles.

■ It has, I think, been clearly established not only that the hurricane was unexpected, but also that it was of unprecedented violence. This should be enough to exonerate both railroad companies if they were themselves free from contributory fault. The defenses of inevitable accident and act of God require affirmative proof that the accident could not have been prevented by the exercise of "human skill and precaution, and a proper display of nautical skill". The Louisiana, 3 Wall. 164, 70 U.S. 164, 173, 18 L.Ed. 85. This language was interpreted in The Charles H. Sells, 2 Cir., 89 F.2d 631, 633, to mean that a vessel asserting such a defense "must show herself free from 'fault' in the ordinary sense". See also The Lackawanna, 2 Cir., 210 F. 262; The Anna C. Minch, 2 Cir., 271 F. 192; Martin v. Lotz, 126 Conn. 529, 12 A.2d 772.

■ First: As to the liability of the Erie Company. The Martin Company challenges the showing made by the Erie Company in three principal respects, namely, (1) that no efforts were made to move the Nos. 172 and 196 from their positions on the south side of Pier 3 to more protected locations after the wind and seas had increased in strength and violence; (2) that the lines between the No. 196 and the No. 104 were in bad condition and not properly handled, and (3) that no assistance was given to the lighters after they brought up against the No. 225. The testimony bearing on these contentions is quite voluminous, and need not be considered in detail; it does, however, require some comment.

It has already been found that the Nos. 172 and 196 were moored outside of the No. 104 on the south side of Pier 3 about 400 feet from the pier end. I do not think this position was unsafe, at least until after 2:04 P. M. (3:04 D. S. T.), when the wind shifted to northwest. The berth was sheltered from the north wind, which had been blowing continuously all morning and had never exceeded an average velocity of 46 miles, and the waves were not high enough to cause anxiety for the safety of the boats. After 2:04 P. M. (3:04 D. S. T.) there was no opportunity to move the lighters further up the slip before they broke adrift. The strongest proof that the boats were not in an unsafe position came from Helland, captain of the Lehigh Valley tug Slatington, who testified as a witness for the Martin Company. Helland said that he arrived at the slip at about 2:55 or 3 P. M. with the Lehigh Valley barge No. 75 in tow alongside and that at 3:15 P. M. he moored the No. 75 at an angle on the south side of Pier 3, about halfway up the slip, just north of the Lehigh Valley barge No. 469, which was also at an angle to the pier. Helland would hardly have left the No. 75 in the position he did at 3:15 P. M. if he had thought there was any danger in the conditions then prevailing in the slip.

The criticism with respect to the lines is directed not only to the lines actually running from the No. 196 to the No. 104, but

to the failure to put out additional lines. The No. 196 had four 5 inch lines and two 3½ inch lines. Two of the 5 inch lines were put on the boat on September 5, 1938, or about two weeks before the accident; one of the other two 5 inch lines was received in May 1938; and the remaining one in October 1937. One of the 3½ inch lines was put on the boat in May 1938, and the other one in January, 1937. Callahan, captain of the No. 196, said that he came on board the lighter at about 8:30 A. M. on September 21, and found that the boat was made fast to the No. 104 at the outer end with two parts of a 5 inch line, and at the inner end with three parts of a 5 inch line. He thereupon doubled up both lines, and they remained in that condition, without any change, until the boats broke adrift. Callahan also said that the lines which were used were practically new. I think this showing regarding the lines is sufficient. The question whether additional lines should not have been put out is not entirely free from doubt, but in the view I have taken of the suddenness and violence of the storm, I do not think there was any negligence in that respect which contributed to the accident. See Dunnigan v. The Golden Rule, 1925 A.M.C. 297, affirmed The Golden Rule, 2 Cir., 278 F. 1021.

The question whether assistance should have been sent to the lighters after they broke adrift requires only brief consideration. Even if tugs had been available for that purpose, which I doubt, I still do not think that they could have accomplished anything. The tug Slatington, which was near the bulkhead as late as 3:45 P. M., and which left the slip at 3:50 P. M., offered no assistance. Neither did the tug Grace A. Dalzell, which came into the slip for shelter as the Erie lighters were drifting towards the bulkhead. Hammann, captain of the Grace A. Dalzell, testified that it was "impossible to go near the barges on account of the awful sea running in the slip and the way the barges were bobbing up and down and I was bobbing up and down".

I think, therefore, that the Erie Company has substantiated its contention that the breaking adrift of the lighters, and their subsequent collision with the No. 225, resulted from inevitable accident or an act of God.

■ Second: As to the liability of the Pennsylvania Company. The Pennsylvania Company insists that at the time of the accident, its responsibility to the cargo on the No. 225 was that of a warehouseman; it bases its contention on the testimony of Gellert, captain of the No. 225, that he delivered his documents to a "receiving clerk" at Bush Docks on September 19, at 1 P. M. The delivery of these documents to a "receiving clerk" at Bush Docks was not, however, the notice of arrival which the bill of lading required to be "duly sent or given" to the consignee in order that the railroad company might have the benefit of the provision reducing its responsibility to that of a warehouseman. I think, therefore, that the Pennsylvania Company must be held to its liability as a carrier unless it can save itself by showing that the damage was caused by an act of God. Bank of Kentucky v. Adams Exp. Co., 93 U.S. 174, 181, 23 L.Ed. 872; The Ansaldo San Giorgio I v. Rheinstrom Co. 294 U.S. 494, 496, 55 S.Ct. 483, 79 L. Ed. 1016. The burden of making this showing is on the railroad company. Galveston, H. & S. A. Ry. Co. v. Wallace, 223 U.S. 481, 492, 32 S.Ct. 205, 56 L.Ed. 516.

■ The Martin Company criticises the proof offered by the Pennsylvania Company in a number of respects. Some of these criticisms have already been considered. The remainder are directed largely to the position of the No. 225 in the slip and the failure to send assistance after the Erie lighters brought up against the No. 225. With respect to the position of the No. 225 in the slip little need be said. I think this position at the bulkhead was about the safest in the slip despite the fact that the No. 225 was lying outside of the four steel lighters. With respect to the criticism that assistance was not sent after the boats came together, I can add little to what has been said regarding the same contention made against the Erie Company. Gellert, captain of the No. 225, testified that before the Erie lighters came up the slip his boat was lying "pretty fair". He also said that after the lighters brought up against his boat, assistance would have done more harm than good. I think this testimony is borne out by the facts. I hold, therefore, that the damage to the cargo on the No. 225 was due to an act of God.

There may be decrees (1) in the Pennsylvania proceeding exonerating the Pennsylvania Railroad Company from liability on all claims; and (2) in the two Erie proceedings exonerating the trustees of the

Erie Railroad Company from liability on all claims; all with costs to the successful parties.