**Luis MARTINEZ, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 819, Docket 82–6233.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 24, 1983.

Decided April 12, 1983.

Paul C. Matthews, New York City, for appellant.

Craig S. English, Atty., U.S. Dept. of Justice, New York City (J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., John S.

Martin, Jr., U.S. Atty., Janis G. Shulmeisters, Atty., New York City, of counsel), for appellee.

Before OAKES, PRATT and WEIS,[*] Circuit Judges.

OAKES, Circuit Judge:

A seaman injured when his vessel parted her moorings appeals from an adverse admiralty judgment of the United States District Court for the Southern District of New York, Charles E. Stewart, Jr., Judge. The district court found the vessel USNS Sealift Arabian Sea ("Arabian Sea"), seaworthy and not negligent where, while pumping off a cargo of jet fuel at a mooring in the Piscataqua River near Newington, New Hampshire, the combination of a strong current in the river and the angle of the current pushing the vessel off the concrete caissons which served as her dock caused her mooring lines to part, one by one. The seaman, Luis Martinez, was injured while scrambling from port to starboard to shut off valves on the cargo hoses to avoid the danger of explosion or fire. We reverse on the ground that the vessel was, on this record, unseaworthy as a matter of law, and remand to the trial court for proceedings consistent with this opinion.

On November 2, 1978, the "Arabian Sea" docked in the Piscataqua, just upriver from Portsmouth, New Hampshire, to unload her cargo of JP4, a volatile form of jet fuel. Before docking, her captain, Robert P. Ruse, who had docked another vessel at the same berth two months before, consulted tide current tables. These indicated to him a current of about 4.6 knots at 1653 hours, what he called "a slightly stronger than average, not unusual" current.[1] The ship's pilot advised him, however, that the current was going to be "very" or "fairly" strong.

Captain Ruse later was of the view that the current was in fact 7.5 or 8 knots when the lines parted.

This unfavorable situation was complicated by a number of factors: (a) the size of the Arabian Sea, which was 587 feet long, 84 feet abeam, with deadweight tonnage of 27,500; (b) the narrowness of the Piscataqua at the mooring, causing the current to increase at this bottleneck; (c) the configuration of the dock, which consisted of three cement cylinders with open water between them and between the shore and them, but located closely enough together so that a lengthy portion of the bow of the vessel projected beyond them upstream in the open river, making for greater leverage from the current; (d) the 45° to 50° angle of the moored vessel to the current, which further promoted the force of the current and tended to cause the vessel to pull away from the dock; and (e) the full load. Because of the highly explosive and flammable cargo, the berthing of another vessel downriver, and other docks and obstructions nearby that might rip open the hull of a loose vessel, the escape of the "Arabian Sea" would have been, and was momentarily, in the Captain's words, a "tremendous" danger to life and property.

The Captain took precautions. Rather than the usual eight to ten lines, the Arabian Sea was secured with all eighteen mooring lines of which five were wire. Captain Ruse also "backed out" or "hung off" both port and starboard anchors, ready to drop in case of emergency. However, at the time of peak current, 1645 to 1650, just as she was beginning to pump out, one of the wire mooring lines on a constant tension winch that was under severe strain began "jumping . . . paying out, slacking off." A couple of the polypropylene ropes started to part, and the Captain rang general alarm. Mar-

---

[*] The Honorable Joseph F. Weis, Jr. of the United States Court of Appeals for the Third Circuit, sitting by designation.

1. Captain Ruse testified that he read the tables as showing a 4.6 knot current at a point south of Frankfort Island. The vessel was moored four-tenths of a mile *north* of Frankfort Island, however, and the figure was actually 3.68 knots. The tables showed higher velocity ratios for points in the river seven-tenths of a mile upstream (Dover Point) and three miles downstream (Nobles Island), with maximum currents of 5.29 and 5.52 knots respectively. All of the current tables, of course, are merely predictions, not certainties.

tinez ran to close the port cargo valves immediately because of the danger the cargo hoses would break. Martinez then rushed to close the starboard valves. The fore and aft centerline pipes blocked his way, but rather than take the indirect route to the starboard valves over a platform fifteen feet aft of the hose valves, Martinez tried to scramble over the centerline pipes and in doing so, fell. As all the lines parted one by one, and the vessel tore completely away from the berth, breaking the hoses, the officers and crew of the "Arabian Sea" saved the day by dropping both anchors, which had been hung off for just such an emergency purpose. The vessel also apparently grounded, which in the circumstances was a help.

Martinez brought his action under the Public Vessels Act, 46 U.S.C. § 781; the Suits in Admiralty Act, 46 U.S.C. § 745; and the Jones Act, 46 U.S.C. § 688. The district court dismissed the seaman's injury suit, finding that he was not entitled to recover damages because he had not proved negligence or unseaworthiness. The court held that there was no lack of seaworthiness because the circumstances were "extraordinary or unforeseeable" within *Oliveras v. American Export Isbrandtsen Lines, Inc.,* 431 F.2d 814, 815 (2d Cir.1970). *See also Walker v. Harris,* 335 F.2d 185, 191 (5th Cir.), *cert. denied,* 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342 (1964). The judge found that there was "insufficient evidence to lead us to draw an inference that Captain Ruse was on notice of an eight knot current." The judge accepted the Captain's testimony that the current "was more than twice the maximum predicted in the official tidal current tables," credited him with exercising "extraordinary care," and concluded that he "could not reasonably be expect-

ed to foresee the force of the current." Finally, the district court held that even if there were a duty to anticipate the current, the Government established the defense of inevitable accident. We need not disturb the district court's finding of fact that there was no negligence. We do, however, find that the court applied an incorrect legal standard in determining that the ship and her appurtenances were seaworthy.

■ The warranty of seaworthiness obligates an owner to furnish a ship, crew, and appurtenances reasonably fit for her intended service, not an accident-free ship. *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 499–500, 91 S.Ct. 514, 517–518, 27 L.Ed.2d 562 (1971). Liability for unseaworthiness does not depend either on negligence, *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 549, 80 S.Ct. 926, 932, 4 L.Ed.2d 941 (1960); *Mahnich v. Southern Steamship Co.,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), or on notice. *Mitchell v. Trawler Racer,* 362 U.S. at 549, 80 S.Ct. at 932.

■ While ordinarily we might remand for further findings in light of the above principles, in the state of this record we do not think that is necessary. We hold that this vessel whose mooring lines part in a rapid but not extraordinary current was unseaworthy as a matter of law. The defense of unavoidable accident is not available to excuse the unseaworthiness of this ship's mooring appurtenances. The "intended service" of this ship was to unload a hazardous cargo while berthed on the Piscataqua River. The circumstances of that berth included rapid tidal currents and variable velocities at different locations, due to the irregular width and depth of the river as well as the presence of wharves and vessels.[2] Further, the pilot had warned the

2. An excerpt in the record from the U.S. Coast Pilot dealing with the Piscataqua River reads as follows:

General navigation throughout the entire length of the Piscataqua River system is severely hampered by rapid tidal currents. The velocities of these currents differ at various locations because of the irregularities in the width and depth of the river and its tributaries.

The maximum average velocity in the river occurs off Nobles Island and off Dover Point at the entrance to Little Bay, and amounts to over 4 knots on the ebb. For predictions, see the Tidal Current Tables.

The irregularities of width and depth plus the abrupt directional changes of course result in changes in the direction of the currents which at some locations do not coincide

Captain about the strong currents. Two tugs rather than the usual single tug maneuvered the ship to her berth; the Captain was familiar with the situation of the berth from a previous docking; and the bow of the vessel was exposed to "hazardous crosscurrents." The Captain put out several more lines than usual and hung off the anchors; this could indicate that he, too, doubted whether his mooring lines were sufficient. His caution or the fact that, as found by the district court, he could not "reasonably be expected to anticipate the effect of the November 2 current on the mooring lines of the Arabian Sea," might relieve him from negligence. However, in the absence of a finding that the lines were adequate for the intended service of the vessel, the Captain's caution or anticipation would not relieve the vessel from unseaworthiness.

■ The case law on the subject of vessels parting their moorings is instructive on the defense of inevitable accident.[3] In *The Louisiana,* 70 U.S. (3 Wall.) 164, 18 L.Ed. 85 (1865), which also involved a short wharf, exposing a large portion of the vessel to wind and current,[4] the Court held that the vessel, drifting from her moorings, "must be liable"—in this case for collision damage —"unless she can show affirmatively that the drifting was the result of an inevitable accident, or a *vis major,* which human skill and precaution, and a proper display of nautical skill could not have prevented." *Id.* at 173. In other words, the vessel that breaks loose from her moorings has the burden of establishing inevitable accident or *vis major,* and the burden is not easily met.

In *Swenson v. The Argonaut,* 204 F.2d 636 (3d Cir.1953), the court followed *The Louisiana;* the "Argonaut," which had parted her moorings during a summer thunderstorm accompanied by sixty mile-per-hour winds, was held not to have carried her "heavy burden of proving inevitable accident." *Id.* at 640.[5] More recently the Third Circuit in *Zubik v. Zubik,* 384 F.2d 267 (3d Cir.1967), *cert. denied,* 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968), followed *The Louisiana* and *Swenson v. The Argonaut* in holding that the "heavy burden" was not met in a situation where an unusually large ice floe coming down the Allegheny River broke several of the appellants' barges loose from their moorings. To be sure, the court there noted that the record showed

> such sufficient evidence of warning of the ice flo[e], time to act to move some or all of the barges to safe waters, improper

---

with the direction of the channel and cause hazardous crosscurrents.

As a result of the combination of rapid tidal currents and hazardous crosscurrents, navigation of deep-draft vessels is limited to the 3-hour period consisting of 1.5 hours before and 1.5 hours after slack water during daylight.

**3.** These of course are negligence cases, and are not binding on the issue of liability for injury caused by unseaworthiness, because the exercise of due diligence does not relieve the owner of his obligation to furnish a seaworthy ship with adequate appliances and equipment. *The Osceola,* 189 U.S. 158, 173–75, 23 S.Ct. 483, 486–487, 47 L.Ed. 760 (1903) (dictum). *See also Mahnich v. Southern Steamship Co.,* 321 U.S. at 98–100, 64 S.Ct. at 456–457 (owner liable for furnishing unseaworthy appliance, a defective rope used in staging); *The Arizona v. Anelich,* 298 U.S. 110, 121 n. 2, 56 S.Ct. 707, 710 n. 2, 80 L.Ed. 1075 (1936) (tracing development of principle of liability for injury caused by unseaworthiness). *See generally* G. Gilmore

& C. Black, The Law of Admiralty (2d ed. 1975) 383–404.

**4.** The *Louisiana* Court commented on a tide change striking the vessel with a momentum increased by a high wind, "multiplied by the leverage resulting from the length of the vessel exposed below the wharf." 70 U.S. (3 Wall.) at 174. The Arabian Sea was exposed above the wharf, but the momentum of the current was surely multiplied by a similar leverage.

**5.** *The Anna C. Minch,* 271 F. 192, 194–95 (2d Cir.1921) noted the heavy burden on the party asserting the defense of inevitable accident. In that case, a vessel moored in the Buffalo River parted all her lines at once when peculiarly exposed to a spring flood of ice and water when ice, dammed up at a bridge, broke free. Because all the lines were taut and went out at once, and added precautions had been taken in anticipation of the ice dam's breaking, the defendant was held to have met the burden, and not to have been negligent.

fastenings of some lines, and improper positioning of the fleet of barges. that findings of negligence were sustained. *Id.* at 270.

The fact that the ship broke loose from her moorings raised a presumption of unseaworthiness which the defendant was required to overcome. The "Arabian Sea" has not met her heavy burden of proving inevitable accident. The currents, even if three or four knots stronger than predicted by tables, were not so great that the vessel should not have been equipped to encounter them, particularly in sometimes rain-swept New England in November. There was no finding by the trial court that considering the place, situation and configuration of the berth, the trickiness of the Piscataqua River currents, and the kind of cargo being carried, the mooring lines were adequate for the vessel. If the Captain's estimate that the current was eight knots was indeed correct, the lines should have been able to withstand it. Such a current is not so far beyond that expected in a tidal estuary as to constitute a *vis major*. When mooring lines are incapable of securing a vessel fast to a berth with which the master, if not the officers or crew, is familiar, for whatever combination of circumstances short of *vis major*, the ship cannot be deemed seaworthy, the lack of negligence on the part of the vessel or her master notwithstanding. If Martinez' alleged injury was caused by this unseaworthiness, he is entitled to receive compensatory damages. *Mahnich v. Southern Steamship Co.*, 321 U.S. at 99, 64 S.Ct. at 457. Accordingly, we reverse in part and remand to the district court for further proceedings consistent with this opinion.